566 A.2d 1214

**DEN–TAL–EZ, INC. and Star Dental Manufacturing Co., Inc.**

v.

**SIEMENS CAPITAL CORPORATION, Siemens AG, and Pelton & Crane Company, Appellants.**

Superior Court of Pennsylvania.

Argued June 5, 1989.

Filed Nov. 28, 1989.

Stewart Dalzell, Philadelphia, for Siemens Capital and Siemens AG, appellants.

Arlin M. Adams, Philadelphia, for appellees.

Before CIRILLO, President Judge, and BROSKY, ROWLEY, McEWEN, OLSZEWSKI, TAMILIA, POPOVICH, JOHNSON and MELINSON, JJ.

BROSKY, Judge.

This is an appeal from an order in equity entered on the docket August 26, 1987, which denied post-trial exceptions to a decree nisi and entered the decree nisi as a final decree. The final decree upholds the decree nisi's grant of a permanent injunction, barring appellants from acquiring a competitor of appellees for a period of three (3) years.[1] The purpose of the injunction is to prevent the

---

1. Appellants have captioned their appeal as deriving from numerous dispositions of the court in equity, including: (1) the order granting a preliminary injunction; (2) the order denying appellants' application to revise the scope of the preliminary injunction; (3) the adjudication and decree nisi; (4) the denial of post-trial relief; and (5) the final decree in equity.

However, a preliminary injunction is superceded by a decision on the merits, and terminates upon the issuance of a permanent injunction. *Bryfogle v. Carvel Corp.*, 666 F.Supp. 730 (E.D.Pa.1987); *Izenson v. Izenson*, 274 Pa.Super. 356, 418 A.2d 445, 446 (1980).

Furthermore, a decree nisi is not a final and appealable order; it must be entered as a final decree, following the denial of post-trial exceptions, to be both final and appealable. Pa.R.C.P. 227.1; Pa.R. A.P. 301(a), (d), note.

As such, we elect to treat this as an appeal from the final decree in equity, upholding the grant of a permanent injunction. This is not insignificant, as: (1) the merits of the issues raised on appeal cannot be decided if an appellant has failed to preserve these issues by the filing of timely post-trial exceptions to the decree nisi, Pa.R.C.P. 227.1; and (2) our scope of review differs according to whether the appeal is

disclosure or other use by appellants of allegedly confidential information regarding appellees' business. This information was obtained by appellants during ultimately unsuccessful negotiations between appellants and appellees regarding the sale of appellees' business to appellants.

Appellants now raise the following questions for our consideration:

1. Where sophisticated parties, in merger and acquisition negotiations, enter into comprehensive written agreements governing their relationship and the confidentiality of information exchanged during the negotiations, may the trial court disregard those written agreements and impose other obligations of "confidentiality" unsupported by law or the evidence?;

2. Did the trial court err in granting appellees' requests for injunctive relief, in refusing to limit such relief to the minimum restraint necessary to address any legitimate concerns of appellees, and in thus enjoining appellants from acquiring a competitor of appellees for a period of three years?;

3. Did the trial court err in excluding evidence of appellants' statements, actions, and state of mind during the negotiations offered to show that, contrary to appellees' claims, appellants acted without wrongful intent and in good faith?; and

4. Did the trial court err in admitting in evidence and relying upon (a) testimony as to legal conclusions, and (b) unqualified and unsubstantiated guesses as to the effect of disclosure of unspecified items of "information" to appellees' competitors?

Upon review of the record and the briefs of counsel, we now affirm.

one from a permanent or from a preliminary injunction. See *Pa. Inter. Ath. Ass'n v. Greater Johnstown S.D.,* 76 Pa.Cmwlth. 65, 463 A.2d 1198, 1200 (1983).

It would appear that the issues now before us were raised in post-trial exceptions, and are properly before the Court.

Our scope of review on an appeal from a final decree in equity, including a decree upholding the grant of a permanent injunction, is very limited. We are bound to accept the chancellor's findings of fact, and accord them the weight of a jury verdict where supported by competent evidence. As for the chancellor's factual and legal conclusions, we are not bound by the court's reasoning, and may reverse for an abuse of discretion or error of law.[2] See *Walley v. Iraca*, 360 Pa.Super. 436, 520 A.2d 886, 889 (1987); also see *Jones v. Bonner*, 107 Pa.Cmwlth. 283, 523 A.2d 849, 851 n. 2 (1987).

As a starting point, our review of the record reveals that the chancellor's findings of fact are clearly supported by competent evidence. Thus, we accept those findings as adequately representing the facts of this case and provide the following summary thereof.

Plaintiffs-appellees are Den–Tal–Ez, Inc. and its subsidiary, Star Dental Manufacturing Company, both of which are American companies (hereinafter collectively referred to as "Star"). Syntex Corporation is the parent of Den–Tal–Ez. Defendants-appellants are Siemens AG (a German company), its subsidiary, Siemens Capital Corporation, and Pelton & Crane Company, an indirect subsidiary of Siemens Capital (hereinafter collectively referred to as "Siemens"). Siemens Capital and Pelton & Crane are both American companies.

Star Dental manufactures and distributes small dental instruments called dental handpieces in the United States. Siemens AG also manufactures dental handpieces and larger dental apparatus, which are largely distributed in the

---

**2.** This, however, is not as limited as our scope of review upon the grant or denial of a preliminary injunction, which restricts our inquiry to whether the chancellor had any "apparently reasonable grounds" for the action taken below. It is only if no grounds exist to support the action taken, that our Court may disturb the decision below. *Ogontz Controls Co. v. Pirkle*, 346 Pa.Super. 253, 499 A.2d 593, 595 (1985); *Matt Lamb & Sons, Inc. v. Christian Schmidt Brewing Co.*, 336 Pa.Super. 341, 485 A.2d 836, 840 (1984). It is thus to appellants' advantage that we are treating this appeal as one from the final decree upholding the permanent injunction. See footnote 1.

European market. Pelton & Crane manufactures and distributes large dental apparatus in the United States, but does not manufacture or distribute dental handpieces. In addition to the foregoing parties, several other entities and persons play prominent roles in this matter. They are:

1. Sybron Corporation, an American company with a division called the Midwest Dental Division ("Midwest") which manufactures and distributes dental handpieces in direct competition with Star.

2. Raymond Perelman, President of Star and Den-Tal-Ez beginning October 20, 1986, when he acquired both companies.

3. Goldman, Sachs & Co. ("G & S"), a New York investment banking firm representing Sybron in its efforts to sell its Midwest division to Siemens.

4. Arnhold & S. Bleichroeder, Inc. ("A & B"), a New York investment banking firm representing Siemens in connection with its purchase of Pelton & Crane and its efforts to acquire a dental handpiece manufacturer in the United States.

5. Stanford Warshawsky, Managing Director of A & B.

Simply stated, this saga began when Siemens decided to enter the dental apparatus business in the United States. It first purchased Pelton & Crane in 1985. Since Pelton & Crane did not manufacture dental handpieces, however, Siemens was still intent on acquiring a "stand alone" American facility that was in the dental handpieces business. The two targets of Siemens' interest were Star and Midwest. Midwest was the larger of the two manufacturers. It approached Siemens about a possible acquisition of Midwest in April, 1986. Several meetings among the parties' representatives occurred through the spring and summer of 1986. The individuals involved included high level executives and other representatives of Siemens, Pelton & Crane and G & S.

Siemens detected difficulties with Midwest's operations and found their asking price of $20–21 million too high.

Thus, in late summer of 1986, Siemens backed away from the Midwest deal. It then initiated discussions with Star through Warshawsky. The discussions were actually initially held with Perelman who was about to purchase Star. Perelman stated that he would not be interested in discussions with Siemens if it was still interested in Midwest. Warshawsky stated that Siemens was no longer interested in Midwest and Perelman relied on that representation in commencing negotiations with Siemens.

On October 3, 1986, Perelman sent an offering memorandum, describing Star's operations and certain consolidation and other plans for the improvement of Star's operations, to Warshawsky, who forwarded it to Siemens. At an October 19th meeting of the parties, including several of the representatives of Siemens who had participated in the Midwest negotiations, they agreed that Siemens people would visit Star in the near future. On the same day, and at the same location (a dental convention in Miami), representatives of Siemens also met with the President of Midwest. Midwest's President informed Siemens that he was trying to correct Midwest's problems. Star did not know of the Midwest meeting; Midwest did not know of the Star meeting.

The next day, Perelman closed on his acquisition of Star. Four days later, representatives from Siemens visited Star and were favorably impressed. Mr. Behne, Executive Director of the Dental Division of Siemens, attempted to get Perelman to drop the price of Star by stating that there was still a possibility that Siemens would purchase Midwest. Perelman repeated that he would not continue to negotiate if Midwest was still in the picture. Behne represented that the Midwest deal was "dead" because of various labor, production and profitability problems Midwest had. He did not mention the October 19th meeting between Siemens and Midwest's President.

Siemens then asked to do a financial and operations "due diligence" review of Star. Perelman agreed, but required that Siemens first execute a letter of intent, regarding the

acquisition, and a confidentiality agreement, obligating them not to use or disclose any confidential information they obtained regarding Star during the review. Such agreements were executed on December 5, 1986. They were prepared by Siemens' counsel.

There are two highly pertinent sections of these agreements. The Letter of Intent, expressly governed by Pennsylvania law, does not contain a "no-shop" clause preventing Siemens from negotiating with other companies with an eye to acquiring them. The Mutual Non–Disclosure Agreement, expressly governed by New York law, pertinently provides as follows:

1. For the purpose of this Agreement Confidential Information shall mean any information and date of a confidential nature, including but not limited to propriety, developmental, technical, marketing, sales, operating, performance, cost, know-how, business and process information, computer programming techniques, and all record bearing media containing or disclosing such information and techniques which is disclosed pursuant to this Agreement.

. . . . .

3. All confidential Information exchanged between the parties pursuant to this Agreement:

(a) shall, if in written form, be marked 'Confidential' or similarly legended by the disclosing party before being turning over to the receiving party. All oral disclosures of Confidential Information will be summarized, in writing, by the disclosing party and said summary will be given the receiving party within 30 days of the subject oral disclosure. The receiving party must make any objections to the contents of the summary, in writing, within 30 days of receipt;

The Agreement further provides that all confidential information exchanged pursuant to the Agreement will not be used by the receiving party for its own purposes.

Despite the fact that the Agreement was executed on December 5, 1986, Siemens wished to proceed in haste with its "due diligence" review of Star, and requested to proceed on December 8, 1986, a mere three (3) days later. As the records involved were voluminous, comprising a minimum of sixty-five (65) boxes of files, Star agreed to give Siemens unrestricted access to the records, to review and copy whatever they wished. Because of the haste with which Siemens wished to proceed, few, if any, of the materials obtained by Siemens in the course of its review were stamped "confidential" or summarized in writing. Nevertheless, representatives of Siemens, including a Mr. Vitt, who was involved in the review, testified that material did not have to be stamped "confidential" in order to be regarded as confidential.

During the review, in the precise words of the trial court, Siemens obtained:

critical business information regarding Star's past and present personnel, employee compensation, its manufacturing facilities, material suppliers, material costs, confidential license agreements, its product, marketing programs and price and cost information. This included confidential information on Star's sales and profit margins on an individual product-by-product basis. Star's inventories by product groups were also provided to defendants together with inventory projections for the next three years. Defendants acquired confidential information on Star's labor costs, suppliers and vendors. Technological confidential information was also disclosed; the German engineer [a Siemens employee] toured Star's entire manufacturing facilities and obtained details concerning Star's prophy syringe, optic fiber swivel handpiece and other research and development programs.

Importantly, just one day before these agreements were signed, and only three days before Siemens conducted its review of Star, Siemens and Pelton & Crane representatives again met at a prearranged meeting with Midwest's top officers, who produced further information concerning im-

provements in Midwest's situation. The purpose of the meeting was to enable Siemens to come to a final decision regarding the acquisition of Midwest. A follow-up meeting after the year-end holidays was arranged.

Siemens did not inform Star of any problems with the results of its review, and advised Perelman through Warshawsky that a definitive acquisition agreement was being prepared through Siemens' counsel. In fact, on December 18, only seven days after the review was completed, Siemens decided not to go forward with the purchase of Star.

On January 8, 1987, representatives of Midwest met with Siemens' representatives. Details regarding the reorganization of Midwest were conveyed to Siemens. On January 13th, Siemens formally terminated its letter of intent with Star. On February 9th, Midwest and Siemens again discussed the purchase of Midwest and such negotiations continued thereafter.[3] Midwest did not know of the Star transaction until April 24, 1987, when Star secured its temporary restraining order barring Siemens' purchase of Midwest.

After the entry of the temporary restraining order, and following an expedited evidentiary hearing, the trial court issued a preliminary injunction once again enjoining the acquisition of Midwest. On July 31, 1987, the court entered its adjudication and decree nisi, which granted a permanent injunction against the acquisition for a period of three years. Following the filing and denial of post-trial exceptions, the court entered the decree nisi as a final decree, and upheld the permanent injunction as issued. This timely appeal followed.[4]

**3.** Several of the Siemens' representatives involved in the "due diligence" review of Star were also involved in a "due diligence" review of Midwest in February of 1987, during the final phrase of the Siemens–Midwest negotiations.

**4.** A panel of this Court handed down a decision, affirming the final decree and upholding the permanent injunction as granted. That decision was filed on October 21, 1988 (Cavanaugh, Beck and Hester, JJ, Opinion by Beck, J., Dissenting Opinion by Cavanaugh, J.). Appellants petitioned for reargument before the full Court on November 4,

With the factual scenario in place, we now proceed to the trial court's numerous conclusions of law, upon which the court based its decision to issue the permanent injunction herein. Those conclusions may be reduced to the following fundamental propositions:

1. Siemens and Star were in a confidential relationship implied in law and expressly created by the Mutual Non-Disclosure Agreement.

2. This relationship imposed upon Siemens an implied obligation to deal with Star in good faith.

3. Siemens had represented to Star that it had no interest in acquiring Midwest when Siemens first began discussions with Star and thereafter repeated that representation, Siemens had a duty to disclose its continued and renewed interest in Midwest. Siemens' failure to do so constituted both misrepresentation and a breach of the duty of good faith.

4. The information Star provided to Siemens during its due diligence review of Star constituted trade secrets and confidential information both as a matter of law and pursuant to the Mutual Non-Disclosure Agreement. Siemens obtained this information pursuant to a confidential relationship with Star.

5. Any disclosure of the confidential information will constitute a breach of the Mutual Non-Disclosure Agreement and a misappropriation of Star's trade secrets.

6. Use of such information to Star's competitive detriment is inevitable if Siemens acquires Midwest.

7. Star will be irreparably harmed by Siemens' breach of the Mutual Non-Disclosure Agreement and misappropriation of Star's trade secrets if a permanent injunction is not issued, since such an injunction is the only way effectively to prevent use of the confidential information.

1988. That petition was granted on December 21, 1988, and the case was reargued en banc on April 21, 1989.

In deciding to affirm, we have relied substantially upon the reasoning of the original panel, and have largely adopted the Opinion by Beck, J., in our disposition.

8. There is no adequate remedy at law since the measure of economic harm Star might realize at the hands of Siemens is incalculable.

9. Issuance of the injunction results in less injury than would refusal to issue an injunction.

10. The public interest in corporate morality and fair dealing is promoted by the injunction.

In the course of reaching these conclusions, the trial court also resolved several sub-issues on which some of its major conclusions depend. These include:

1. The fact that the Mutual Non–Disclosure Agreement contains an integration clause, providing that it is the entire agreement of the parties regarding the subject matter thereof, does not exclude consideration of Siemens' representations regarding the subject matter of the Letter of Intent, which contains no integration clause, and throughout the negotiations.

2. The termination of the Letter of Intent on January 13, 1987 did not terminate Siemens' continuing obligation to keep Star's confidential information confidential under the Mutual Non–Disclosure Agreement, which by the terms of the Agreement continues for five years from the receipt of any such information.

3. Information did not have to be marked "confidential" for it to be protected under the Mutual Non–Disclosure Agreement.

Appellants' first issue on appeal challenges, in somewhat rhetorical fashion, several of the above conclusions. Despite the apparent complexity of this case, Siemens' position may be distilled into several fundamentally simple contentions.

Siemens maintains that its conduct throughout its negotiations with Star was in accordance with normal commercial practice, despite the less than responsible course of conduct seemingly presented by the above factual scenario. Specifically, Siemens argues that the court committed errors of law in its interpretation of the Mutual Non–Disclosure

Agreement and the Letter of Intent, as individual documents and as interrelated documents; in imposing upon Siemens any obligations of confidentiality under either the Agreement or common law; and in imposing upon Siemens an obligation of dealing with one company at a time, when the Letter of Intent did not require such dealing.

Star, on the other hand, is in the fortunate position of having convinced the trier of fact to accept Star's version of the facts. That version clearly casts Star as victim and Siemens as oppressor and deceiver. Thus, Star asks us to affirm the trial court's holding that both the Agreement with Siemens and Pennsylvania common law protect against such allegedly fraudulent conduct and misappropriation of trade secrets via the equitable tool of injunction.

Though bound by the trial court's findings of fact, which clearly favor Star, we are not bound, as noted previously, by the court's factual and legal conclusions. *Walley*, supra; *Jones*, supra. We thus proceed to examine Siemens' contentions of error.

Appellants' primary argument centers on the Mutual Non–Disclosure Agreement and the Letter of Intent executed by the parties prior to Siemens' thorough review of Star's business in December, 1986. In capsule form, the argument is that the Agreement and the Letter form the only basis for imposing any liability on Siemens and that they have no liability thereunder. In other words, they argue that the Agreement and Letter preclude Star's recovery under any other tort theory, including misrepresentation or misappropriation of trade secrets.

Specifically, Siemens argues that the Letter of Intent can only be construed to have obligated the parties to negotiate, but was terminable at will and gave rise to no obligation to continue to negotiate, to negotiate only with Star, or to close the deal.

Further, appellants strenuously argue that they have no liability under the Mutual Non–Disclosure Agreement. They focus on the fact that the Agreement states that all

confidential information Star would give Siemens during the business review would be designated, i.e., marked "confidential". Since the testimony was clear and indeed the parties stipulated that very little, if any, of the information that Star gave Siemens was ever marked, Siemens argues that Star has lost or waived the protection of the Agreement. Thus, Siemens states:

> Siemens received no "confidential information" of Star pursuant to the parties' agreements. It thus did not and could not have violated any of its undertakings with Star.

Brief for Appellants at 34.

Appellants also point to the merger or integration clause in the Agreement, which basically states that the Agreement represents the entire agreement of the parties with regard to the subject matter thereof. Actually, in their appellate brief appellants state that the parties agreed to a "merger" clause "which provided that their *writings* constituted their entire understanding" (emphasis added). Brief for Appellants at 32. This is misleading. Only the Agreement contains a merger clause. The Letter of Intent does not. Further, appellants fail to note that the merger clause only states that the Agreement is the entire understanding of the parties only as to the *subject matter thereof,* i.e. protection of confidential information. Nevertheless, appellants appear to argue that the merger clause should somehow be read as applying equally to the Letter of Intent and that it lends further support to the proposition that Siemens' only obligations to Star are those found expressly stated in the Agreement and the Letter.

Thus, appellants argue that the trial court's basic errors were its conclusions that Siemens did receive confidential information that was protected under the Agreement, did receive Star's trade secrets, which must be protected under the common law of the tort of misappropriation of trade secrets, and did commit misrepresentation in connection with its negotiations with Star.

■ We reject these arguments on the basis of several basic principles. First, we address the effect of the Mutual Non–Disclosure Agreement. That is, does Siemens have any obligation under it as a result of their receipt of "confidential information" covered by the Agreement? Moreover, does the Agreement preclude Star's claim for relief for misappropriation of trade secrets?

The first question is a matter of contract construction.[5]

The trial court did not find Star's failure to stamp information as "confidential" to be fatal to Star's claim that the information acquired during the "due diligence" was, in fact, confidential, and entitled to protection under the Agreement. The court concluded: (1) that the Agreement does not define confidential information to be only that information so marked, making the stamping procedure a mere "housekeeping" measure to avoid later controversy; and (2) that, regardless of whether stamping was required, Siemens' later conduct in insisting upon hasty access, with the understanding that documents accessed would be considered confidential, waived the stamping requirement.

We do not concur in the court's initial conclusion of law, i.e. that the Agreement does not require stamping of confidential information. A purely common sense reading of paragraph 3(a) of the Agreement clearly indicates, in its usage of mandatory terms such as "shall", "will", and "must", that Siemens fully intended a stamping requirement in its inclusion of this paragraph in its preprinted form. As Star agreed to the pre-printed form, we cannot say that Star would not have been bound by the stamping procedure, on the face of the Agreement viewed in isolation.

**5.** We note that construction of the Mutual Non–Disclosure Agreement is by its own terms governed by New York law and we have used the law of that state to guide our analysis of this issue. We also point out that although in a footnote in their brief, appellant protest the trial court's application of Pennsylvania law to the balance of the issues presented in this case, this assertion does not appear in any of appellants Statement of Questions Presented on appeal and we will, therefore, not review this aspect of the trial court's determination. Pa.R.A.P. 2116(a).

■ However, we do concur in the trial court's conclusion that Siemens' conduct waived the requirement.

Waiver is the "voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed." *Davison v. Klaess,* 280 N.Y. 252, 20 N.E.2d 744 (1939); *Lord Construction Co. v. Edison Portland Cement Co.,* 234 N.Y. 411, 138 N.E. 39 (1923).

■ There may be a waiver by express agreement, or through estoppel. An express waiver is in the nature of a new contract, which modifies the old; an estoppel, on the other hand, forbids the assertion of the truth, i.e. the contract, by one who has knowingly induced another to believe what is untrue, i.e. that strict contractual compliance will not be demanded, and as such misleads another to act accordingly. However, neither waiver by express agreement, nor through estoppel, is required to effect a waiver, as certain words or acts from which an intention to waive may be reasonably inferred, are, when acted upon, sufficient to effect an implied waiver. An implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived. See discussion in *Kiernan v. Dutchess County Mutual Ins. Co.,* 150 N.Y. 190, 44 N.E. 698 (1896); also see *Lord,* supra.

We find, as did the trial court, such conduct on the part of Siemens in its approach to the "due diligence" review of Star. A pre-printed form, containing a previously undiscussed stamping procedure, was presented to Star a mere three (3) days before Siemens wished access to a voluminous amount of information. The expeditious manner in which Siemens wished to proceed, as a practical matter, clearly did not provide Star the time to mark its documents, and evinced Siemens' unexpressed intent to waive the stamping procedure.

■ We do not find Siemens' argument that the Agreement requires, through its "merger clause", a written waiver duly executed by the parties, to be persuasive. The same "merger clause" provides that the Agreement is to be governed by New York law. New York courts have previously refused to uphold contractual clauses forbidding implied waiver, of any provision of the contract, where conduct reasonably implying a waiver has induced another to justifiably assume that a waiver has occurred and to act accordingly in reliance thereof. See *Kiernan*, supra.

Our conclusion is further buttressed by the testimony the trial court heard from Siemens' own representatives, to the effect that they considered all the business information obtained from Star to be confidential. Several Siemens and Pelton & Crane executives expressly so testified. While this testimony may not establish as a matter of law that certain information was or was not actually confidential, it nonetheless provides further evidence that Siemens acted in such a manner as to impliedly waive the stamping requirement, with the understanding that the information received would be deemed confidential in the absence of stamping, and that Star justifiably relied upon Siemens conduct in giving Siemens access to its files without stamping documents.

In sum, we find no error in the trial court's conclusion that Siemens did receive confidential information from Star which was subject to the protection of the Agreement.

■ We next consider the argument that parties who execute a confidentiality agreement thereby impliedly waive all of the protections of the common law of unfair competition, i.e. protection against misappropriation of trade secrets. We also find this argument to be manifestly contrary to the law of Pennsylvania and that of numerous other jurisdictions.

Pennsylvania cases involving common law causes of action for misappropriation of trade secrets frequently present factual settings including the existence of a confi-

dentiality agreement between the parties. For example, in *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982), the Court affirmed the imposition of an injunction protecting the plaintiff's trade secrets under common law tort principles relating to misappropriation of trade secrets even though the parties had also executed a confidentiality agreement. The Court specifically commented on the relevance of the confidentiality agreement to the tort action. It stated that the agreement constituted evidence of the existence of a confidential relationship between the parties, which is an often important factor under common law in the analysis of whether a party is entitled to an injunction against the use or disclosure of its trade secrets. *Id.,* 442 A.2d at p. 1118 n. 7. There is no suggestion in *Air Products,* or in any other Pennsylvania case, that the existence of a confidentiality agreement precludes a common law trade secrets action.

*See also* Restatement of Torts, § 757 comment c (breach of confidence may also be a breach of confidentiality contract, but whether or not there is such a contract, common law liability for misappropriation of trade secrets may still be imposed); *Ecolaire v. Crissman,* 542 F.Supp. 196, 206–07 (E.D.Pa.1982); *Metallurgical Industries, Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1203 (5th Cir.1986) (theory that confidentiality agreement precludes liability under common law misappropriation of trade secrets theory is inconsistent with Section 757 of Restatement's theory of liability).

In point of fact, appellants provide the very reason such a suggestion would not be a fair interpretation of the law. As *Spring Steels, Inc. v. Molloy,* 400 Pa. 354, 162 A.2d 370 (1960), cited in appellants' brief, highlights, the terms "confidential information" and "trade secrets" do not equate, and may in fact refer to entirely different bodies of information. Certain information protected by agreement may be protected *only* by agreement, as it is considered by a business to be confidential, while not necessarily qualifying as "trade secrets"; conversely, a confidentiality agreement may provide the only evidence of a "confidential relation-

ship" under a common law "trade secrets" analysis. *Id.,* 162 A.2d at pp. 372, 373. If the two actions are not permitted to be brought simultaneously, where the underlying facts support both causes of action, the possibility exists that a full recovery, for all "secret" information unfairly and misleadingly appropriated, will be denied.

The cases appellant cites to the contrary do not persuade us. One of the cases, *Heyman v. AR. Winarick, Inc.,* 325 F.2d 584 (2d Cir.1963), is completely inapposite. The other, *Ferroline Corp. v. General Aniline & Film Corp.,* 207 F.2d 912 (7th Cir.1953), *cert. denied,* 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954) (applying New Jersey law), did not hold that the existence of a confidentiality agreement precluded a separate tort action arising from the same course of events. In fact, the *Ferroline* Court found that no confidential relationship existed between the parties because, unlike in the instant case, the contracts between them specifically did not require that the information in question be kept confidential. *Id.,* at p. 922. It also recognized that a confidential relationship can be implied in a situation similar to the instant one even lacking an express agreement. *Id.*

We are equally unconvinced by appellants' argument that the existence of the Agreement and the Letter preclude relief from Siemens' misrepresentation. Here, appellants again rely upon *Ferroline, supra,* and argue that the fact that the Letter of Intent contained no express restriction on Siemens' ability to negotiate with others, i.e., Midwest, while negotiating with Star precludes a grant of relief to Star based on Siemens' alleged misrepresentation of its lack of interest in purchasing Midwest. We have already indicated our dissatisfaction with *Ferroline* as authority for the proposition that the existence of a confidentiality agreement precludes a common law action for misappropriation of trade secrets. We find the case equally unpersuasive on the issue of whether Star and Siemens' contracts preclude Star's contention that it was deceived, i.e., that it entered into negotiations with and disclosed

valuable information to Siemens in reliance on Siemens' false assurance that it was *not* then involved in pursuing an acquisition of Midwest.

The fact that the Letter of Intent does not expressly prohibit Siemens from negotiating with others while negotiating with Star does not in any way erode Star's actual theory of relief here. Star contends that it had an understanding with Siemens that Siemens would not pursue a deal with Midwest while pursuing the acquisition of Star, or, alternatively, that Siemens made such a representation to Star, on which Star relied to its detriment. Surely Star is not barred from submitting evidence on this question or from pressing this claim merely by the existence of the Letter. In the absence of a merger clause in the Letter, or any other evidence that the parties intended the Letter to be their entire agreement on the subject thereof, the parties were clearly free to prove the existence of other agreements relating to that subject matter, including their oral agreement that Siemens would not negotiate with Midwest while negotiating with Star. *Murray v. University of Pennsylvania Hospital,* 340 Pa.Super. 401, 490 A.2d 839, 844 (1985).

The Letter itself does not address the subject of Siemens' possible negotiations with Midwest or any other company. The Letter purports to be nothing more than what it is—a statement of the parties' present intent to go forward with a planned acquisition of Star by Siemens and an outline of the basic terms of that acquisition. We do not regard the Letter as an exclusive statement of the parties' understanding.

Further, the trial court heard and credited testimony regarding why the Letter does not address the Midwest issue. Jeffrey Perelman, an executive at Star and the son of its owner, testified that Star did not insist on an express agreement by Siemens that it would not negotiate with Midwest while negotiating with Star because the entire negotiation between Star and Siemens had been premised on Siemens' representation that it was no longer consider-

ing an acquisition of Midwest. This representation was originally made to Mr. Perelman, the owner of Star, when Siemens first approached Star regarding its purchase. It was repeated to Mr. Perelman after Siemens' brief tour of Star's facilities in October 1986. Mr. Perelman testified that on both occasions, he expressed his adamant refusal to continue to negotiate with Siemens if it was still interested in acquiring Midwest. Given Siemens' repeated statement that it was not still interested in Midwest, Star reasonably saw no need to insist on a clause in the Letter that specifically prohibited such dual negotiations. It obviously considered such to be an underlying premise of its negotiations which would in no way be waived by a later execution of a Letter of Intent outlining the parties' intent to continue to negotiate toward a final agreement.

Nor does the Mutual Non–Disclosure Agreement bar Star's claim for relief based on Siemens' misrepresentations. The Agreement addresses only one subject—disclosure of confidential information. Admittedly, in the Agreement's merger clause, it expressly supercedes all prior communications, understandings or agreements *relating to the subject matter* thereof. The flaw in Siemens' argument on this ground is that the misrepresentation on which Star relies, i.e. the prior "understanding" of the parties relating to Midwest, is unrelated to the subject matter of the Agreement. The subject matter of confidential information is related to this misrepresentation only by virtue of the fact that Star alleges that the *result* of the misrepresentation was the disclosure of Star's confidential information to a potential competitor. This is far different from a case where a party seeks to introduce evidence outside of an agreement with a merger clause to prove a misrepresentation that is directly related to and/or contradicted by the terms of the agreement itself. Since the Agreement in this case does not address or even relate to any of the terms of the parties' negotiations, we cannot see how it could bar Star's claim for relief from misrepresentations allegedly made in the course of and relating to those negotiations.

We find no error in the trial court's consideration of evidence regarding Siemens' misrepresentations regarding Midwest, nor do we find error in the court's determination that the mere existence of the Agreement and the Letter is not a bar to Star's actions based on fraud and misappropriation of trade secrets. These conclusions bring us to what we consider to be the real inquiry in this case. Assuming that Siemens did receive confidential information from Star that was within the protection of the Agreement and that neither the Agreement nor the Letter bar Star's claims for relief—was Star entitled to the relief that the trial court gave it? We conclude that the trial court acted properly. However, in an exercise of our inherent power to affirm on any ground, whether the same or different from that given by the trial court, we have reached this conclusion via a somewhat different route than that taken by the court below.

The trial court found a "seminal exposition of the underlying principles of law" governing this case in *Smith v. Dravo*, 203 F.2d 369 (7th Cir.1953) (applying Pennsylvania law). Although we do find the *Smith* case helpful in analyzing the issues presented, we do not rely on it as heavily as did the trial court in that we do not find it to be completely in accord with present Pennsylvania law.

Smith involved negotiations between the owner of a container business and a potential purchaser thereof. During negotiations, the owner disclosed its "secret designs, plans and prospective customers" to the potential buyer. The parties did not execute a confidentiality agreement. The buyer then decided not to buy the business and began its own competitive manufacture of containers highly similar to the owner's. The owner sued for misappropriation of trade secrets. The Seventh Circuit reversed the trial court's entry of judgment for the defendant-buyer and remanded for the entry of an appropriate injunction against use by the defendant of the secret information. *Id.*, at pp. 371–3, 378.

The *Smith* Court's analysis began with a reference to a seminal trade secrets case in Pennsylvania, *MacBeth–Evans*

*Glass Co. v. Schnelbach,* 239 Pa. 76, 86 A. 688 (1913). Under *MacBeth,* the *Smith* Court found that the existence of a trade secret and communication of the secret to the defendant while he was in a position of trust and confidence were basic prerequisites for securing equitable relief for misappropriation of trade secrets in Pennsylvania. *Id.*

Although *MacBeth* involved a trade secrets action by an employer against his former employee, the *Smith* Court nevertheless applied these basic principles to the case before it, which involved commercial negotiations. As to the existence of a trade secret, the Court took a liberal view, assuming that "almost any knowledge or information used in the conduct of one's business may be held by its possessor in secret." *Smith,* at p. 373. It recognized, however, that the information must not be public knowledge, and although it need not reach the level of invention, it must "represent in some considerable degree the independent efforts of its claimant." *Id.*

The Court concluded that plaintiff did disclose trade secrets to defendants. In doing so, the Court concluded that although all details of the container design were available from inspection of the article itself, i.e., in today's parlance, the container could be reverse engineered, this fact alone would not bar plaintiff's recovery. The Court held that the fact that a secret can be lawfully discovered by defendant, whether through reverse engineering or otherwise, does not foreclose action against him where it is proven that he in fact discovered the secret by unlawful means, i.e., in breach of a confidential relationship. *Id.,* at p. 374.

The Court then proceeded to find that the plaintiff's trade secrets had been communicated to defendant while the parties were in a confidential relationship arising from the circumstances of their negotiations. The Court rejected the contention that the parties were engaged in an arm's length relationship, concluding that it could imply in law an understanding between the parties that the trade secrets were being disclosed in confidence and were not to be used by the

defendant for any purpose other than consideration of the possible purchase of plaintiff's business.

Thus, in *Smith* the Court employed a trade secrets analysis that de-emphasized the nature of the information itself and emphasized the propriety of the conduct of the defendant and the importance of the confidential relationship between the parties.

In the case *sub judice,* the trial court followed the *Smith* analysis. The court appears not to have engaged in a particularly close analysis of which of Star's information constituted trade secrets. It simply concluded that all of the information Star gave Siemens was either a trade secret or confidential information as defined in the parties' confidentiality agreement. The court's focus was on the confidential relationship between the parties and on Siemens' conduct in breach thereof. In this regard, the court found the facts even more persuasive of the appropriateness of injunctive relief than were the facts in *Smith.* Here, the trial court found a confidential relationship between the parties not only implied in law as a result of the clearly understood limited purpose for which Star gave Siemens its confidential information, but also expressly stated in the Mutual Non–Disclosure Agreement. Moreover, it found that Siemens had breached a duty of disclosure regarding its dealings with Midwest and that this constituted misrepresentation, whereas no claim of misrepresentation was present in *Smith.*

We too recognize the similarity of the instant case and *Smith* and are also influenced by the express confidentiality agreement and misrepresentations by Siemens. However, we must question certain of the legal conclusions applied in *Smith* in light of our Supreme Court's later statements on a similar issue in *Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 213 A.2d 769 (1965).

*Van Products* did not involve parties engaged in acquisition negotiations. It is a more classic type of trade secrets case involving an alleged misappropriation of secret information by a former employee of the owner thereof who

allegedly disclosed the information to the employee in an implied confidential relationship arising from the employment. Nevertheless, its relevance to this case is clear. The *Van Products* Court rejected the *Smith* Court's conclusion that disclosure of a trade secret by the owner thereof does not destroy the owner's right to protection from one who improperly obtains the secret. It also explained the proper analysis in such a case. The *Van Products* Court stated:

> We feel that the authorities holding that public disclosures destroy plaintiff's right to maintain a cause of action to preserve his trade "secret" as against a competing former employee who has violated a duty of confidence are more sound in theory and practice than those continuing to look to the relationship of the parties as a basis for the action. While recognizing that limited publication and experimental usages are not incompatible with secrecy, we feel that the widespread publication and advertising in this case and the public sale of [the product] ... destroyed Van's right to maintain a cause of action upon a breach of duty not to disclose its 'trade secrets'. The starting point in every case of this sort is not whether there was a confidential relationship, but whether, in fact, there was a trade secret to be misappropriated.

*Id.*, 213 A.2d at p. 780 (citations omitted).

*Van Products* has been construed to have adopted the "property" view of trade secrets and to have shifted the emphasis from whether the conduct of the defendant conformed to its confidential relationship with the plaintiff to a close analysis of whether the information was truly a trade secret. As the Federal District Court for the Eastern District of Pennsylvania correctly explained in *The Anaconda Co. v. Metric Tool & Die Company*, 485 F.Supp. 410 (E.D.Pa.1980):

> There are two competing views on the theoretical basis for legal protection of trade secrets: the "property" view and the "confidential relationship" view.... Justice Holmes stated that the basis of trade secret protection is

the "confidential relations" between the parties, and not the status of the trade secret as intellectual property. The Holmes view has been rejected by the Pennsylvania Supreme Court. *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965). Thus, Pennsylvania adheres to the "property" view of trade secret law.... On that view, the theoretical basis for recovery on a trade secret claim is not merely the breach of a confidential relationship, but also the adverse use of the plaintiff's intellectual property.

*Id.*, at pp. 425–26.

Given this emphasis on the nature of the information sought to be protected, the *Van Products* Court engaged in a close and detailed analysis of each type of information the plaintiff therein sought to protect, and concluded that none of it reached the level of a trade secret.

Cases decided more recently than *Van Products* make it clear that this is still the proper focus in a trade secrets case. They also continue Pennsylvania's general acceptance of Section 757 of the Restatement of Torts as providing the basic outline of our trade secrets law.

The Restatement sets forth the following general definition of a trade secret, which has generally been followed in Pennsylvania:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

Restatement of Torts § 757 comment b. As this general definition indicates, the concept of a trade secret is somewhat nebulous. *Van Products, supra.* The crucial indicia appear to be substantial secrecy and competitive value to the owner. It is clear, however, that the particular character of the information is not relevant under Pennsylvania law. It need not be technical in nature and may consist of compilations of purely commercial information, like customer lists, *Morgan's Home Equipment Corp. v. Martucci*, 390

Pa. 618, 136 A.2d 838 (1957), or projected capital spending and marketing strategies. *Air Products, supra.* The determination is necessarily made on a case-by-case basis.

Sections (a) and (b) of Section 757, also adopted in Pennsylvania, provide the following grounds for a misappropriation of trade secrets action:

One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if:

(a) he discovered the secret by improper means, or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him.

*See Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273, 277 (1976); *College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 468 Pa. 103, 360 A.2d 200, 205 (1976).

 Thus, the existence of a trade secret is a prerequisite. However, Pennsylvania law also requires the existence of a confidential relationship or discovery of the trade secret by improper means. Thus, the conduct of the defendant is not irrelevant. It must also be analyzed to ascertain whether the conduct is in breach of a confidential relationship or, lacking such relationship, was "improper".

Appellants argue that since the *Van Products* analysis is determinative of Star's right to injunctive relief to protect its trade secrets, it is clear that the trial court erred in finding that Star gave Siemens any trade secrets. Appellants contend that under the *Van Products* Court's rigorous analysis of what type of information does constitute a trade secret and its de-emphasis of the wrongful conduct of the defendant, Star was not entitled to equitable relief to protect its alleged trade secrets.

Appellees advance a theory different from both the trial court and appellants. They counter that much of the information they gave Siemens did constitute trade secrets even under *Van Products* and emphasize that there is no litmus test for determining what is a trade secret in a particular case. However, appellees urge us not to focus exclusively

or even primarily on whether the information constituted trade secrets. They insist that in this case, despite *Van Products*, the proper focus is still on the defendant's improper conduct and the duties imposed by the parties' confidential relationship. In appellees' words, this is not "an ordinary trade secrets case." Appellees find this case extraordinary because they allege that Siemens' conduct rose to the level of misrepresentation and is otherwise impermissible under the theory set forth in Restatement of Torts Section 759.

In our view, it is the appellees' position that most accurately reflects the law of Pennsylvania and leads to the most equitable result. As we have demonstrated, the trial court's analysis is flawed in that it improperly applied the trade secrets analysis of *Smith* and not of *Van Products*. Appellants' analysis is also flawed. Appellants incorrectly conclude that under *Van Products* approach, Star gave Siemens no trade secrets. Moreover, appellants fail to recognize that to the extent the information given does not qualify for trade secret protection, it is nevertheless protected under the parties' confidentiality agreement and the trial court's injunction was proper as the only adequate means of redressing Siemens' misrepresentations.

Applying these principles to this case, we must determine whether any of Star's information did constitute trade secrets. We need not devote further time to a discussion of whether the parties here were in a confidential relationship, the other prong of the misappropriation of trade secrets analysis, since it is clear that there was a confidential relationship between Star and Siemens at the time the alleged trade secrets were disclosed to Siemens, both implied-in-law and expressly provided in the Mutual Non–Disclosure Agreement.

The trial court found as a fact, based on competent evidence, that Star provided Siemens the following types of information:

1. past and present personnel and employee compensation

2. manufacturing facilities information

3. material suppliers and costs and vendor lists

4. confidential license agreements

5. product information, including details of the design of several of Star's products and research and development projects

6. marketing programs

7. pricing and cost information

8. sales and profit margins on a product-by-product basis

9. inventory information by product group and inventory projections for the next three years.

Although the court did not define which of these categories of information were trade secrets, we conclude that it was correct in finding that at least some of the information rose to the level of a trade secret.

Under the authority of *Van Products,* information like the identity of Star's material suppliers is not a trade secret in that such information is not considered secret since it can readily be learned in any productive industry. *Van Products,* 213 A.2d at p. 776; *S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1257 (3d Cir.1985). However, information like Star's inventory data and projections, details unit costs and product-by-product profit margin data is protectible as trade secrets. With this information, Siemens can ascertain Star's pricing methods and more effectively compete. This is precisely the type of information that the Third Circuit identified as a trade secret in *S.I. Handling Systems,* a seminal trade secrets case decided under Pennsylvania law. The *S.I. Handling Systems* Court found that although actual costs and prices, i.e. the numbers themselves, may not be secret because easily discovered through other means, trade secret protection may nonetheless be warranted where the defendant obtains costing and pricing information based on a whole gamut of labor cost, overhead, materials and profit margin data, thus se-

curing the ability to ascertain plaintiff's pricing methods. *Id.*, at p. 1257.

Our review of the record also reveals that the nature of the product information Siemens received was sufficiently secret and detailed, including for example information regarding the tolerances of various component parts of Star's handpieces, to warrant protection. *S.I. Handling Systems, Inc., supra* (details of product construction like tolerances of various parts are trade secrets); *see generally Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114, 1122 (1982) (information concerning details of research and development projects, projected capital spending program, bidding procedures, and marketing plans all qualify for trade secret protection); *Continental Data Systems, Inc. v. Exxon Corp.*, 638 F.Supp. 432, 443 (E.D.Pa.1986); *Ecolaire, Inc. v. Crissman*, 542 F.Supp. 196, 206 (E.D.Pa.1982).

We also note the presence of evidence of record regarding the secrecy precautions Star took to protect against disclosure of the foregoing information. The record reveals that Star did require its managers and research and development personnel and sales personnel to execute confidentiality agreements. The record does not reveal any proof by Siemens that the information had in fact ever been disclosed to the public. Thus, Star did take the required "reasonable precautions under the circumstances to prevent unauthorized disclosure" of the information. *Greenberg v. Croydon Plastics Co., Inc.*, 378 F.Supp. 806, 812 (E.D.Pa. 1974).

Having determined that Star did provide Siemens at least some trade secret material, but perhaps not as much as the trial court may have found, we might reverse the injunction the trial court granted and remand for the retailoring of the injunction in light of our more limited definition of the information to be protected. This was the procedure utilized in *S.I. Handling Systems, Inc.*, under similar circumstances. *Id.* at p. 1265. We decline to do so in this case because we find that there are additional

grounds supporting the trial court's injunction outside of the need to protect Star's trade secrets. These grounds are found in the protections afforded by the parties' confidentiality agreement and the law of misrepresentation, particularly in a commercial setting such as this.

We agree with Star that this is not an ordinary trade secrets case. We might restate this proposition, however, by saying that this is not *only* a trade secrets case. We concur in the trial court's finding that Siemens had a duty to disclose to Star its continued contract with Midwest in late 1986, while it negotiated with Star, which was clearly aimed at reviving the acquisition of Midwest that Siemens had first considered in the spring and summer of 1986. We have examined all of the testimony that the court below heard and find it eminently reasonable for the court to conclude, as it did, that Siemens did have continued interest in acquiring Midwest. This continued a material misrepresentation and Star relied thereon in negotiating with Siemens and revealing confidential information to it. *Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 369 A.2d 1172, 1175 (1977); *College Watercolor Group, Inc., supra,* 360 A.2d at pp. 205, 206; *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243, 1251–52 (1983).

We are persuaded by appellees' argument that indeed Pennsylvania does and should recognize conduct like Siemens' in this case as separately actionable under the theory outlined in Section 759 of the Restatement of Torts as follows:

> One who, for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information.

As the comments to this section indicate, the information that is procured under this section need not rise to the level of a trade secret. It only need be confidential business information. Certainly the information Star gave Siemens in this case falls within this definition. The re-

quirement that the defendant procure the information by "improper means" is also squarely fulfilled in this case, in that the comments to Section 759 specifically describe misrepresentation as one species of improper means.

Although we have not located a Pennsylvania case where Section 759 has directly been applied, we find nothing in the law of Pennsylvania that conflicts with the principles expressed therein. In fact, our Supreme Court has expressly refused to place its imprimatur on misrepresentation as a means of competing in the following terms:

Ours is a competitive business system in which it is only natural for one businessman to observe and discover what the competition is doing. This Court, however, will not put a stamp of approval on the use of misrepresentations and espionage as means that fall within the "generally accepted standards of commercial morality and reasonable conduct."

*College Watercolor Group, Inc.*, 360 A.2d at p. 205.

Federal courts construing Pennsylvania law have also found nothing in our law that conflicts with the theory of Section 759 insofar as it prohibits obtaining confidential business information by improper means such as misrepresentation. *Sims v. Mack Truck Corp.*, 608 F.2d 87, 95 (3d Cir.1979) (*Van Products* does not contradict theory of Section 759).

 Although we have concluded that Siemens did receive trade secrets and other confidential information from Star while in a confidential relationship with Star and through misrepresentations, our inquiry is still not at an end. We must proceed to appellants' second issue on appeal, and further review the trial court's conclusion that injunctive relief in the form of a three year bar of Siemens' acquisition of Midwest was the appropriate remedy.

The trial court found this injunction to be the appropriate remedy because it found that disclosure by Siemens to Midwest would be inevitable if Siemens acquired Midwest. Moreover, it found that if such disclosure occurred, Star

would be irreparably harmed and that such harm out-weighed the harm to Siemens from the injunction, and that the public interest would also be served by the injunction because it promotes "commercial morality".

Siemens attacks each of these conclusions. They correctly point out that there is no evidence of record that they have thus far used or disclosed Star's information. They argue that without such proof, no injunction against use or disclosure can issue. Siemens also contests the court's conclusions that Star would actually be injured if Siemens were to use the information in connection with the operation of Midwest and that any injury that was suffered could not be remedied through a damage award. Moreover, Siemens attacks the injunction as overbroad and predicts that if we sanction the injunction, potential acquirors of other Pennsylvania companies will hesitate to go forward for fear of suffering a similar consequence if they ultimately do not close the deal.

We find no reversible error in the trial court's conclusions. We reject Siemens' argument that since Star did not prove past use or disclosure by Siemens, no injunction against future use can issue. There is no support in Pennsylvania law for this proposition. Although obviously one cannot be held liable for damages for misappropriation of a trade secret without proof of actual harm through past use or disclosure, as to injunctive relief, our focus is necessarily prospective. The proper inquiry is not whether defendant already has used or disclosed, but whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future. *See Air Products and Chemicals Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114, 1122–25; *S.I. Handling Systems, Inc.*, supra., at pp. 1263–64. Although proof of past use or disclosure may be relevant to this question, it is not a sine qua non for injunctive relief. *S.I. Handling Systems, Inc.*, supra.

The real question is whether the trial court erred in concluding that a limited injunction, merely barring Siemens from using or disclosing Star's confidential information was

insufficient to protect Star because such use or disclosure was inevitable if Siemens purchased Midwest. Because of this perceived inevitability, the trial court determined that the better course would be to bar the acquisition, but only for three years, the time that the court saw as being the reasonable valuable "life" of the information.

The appropriate scope of an injunction must necessarily be determined in the first instance by the trial court based on its perception of the needs of the plaintiff as balanced against the effect on the defendant. Pennsylvania law accords a court of equity some latitude in this regard. As the *S.I. Handling* Court indicated, "[i]t is clear that under Pennsylvania law a court of equity may fashion a trade secrets injunction that is broad enough to ensure that the information is protected." *S.I. Handling*, at p. 1265 (citing *Air Products, supra*). Of course, the scope of the injunction must also be given the nature and reasonably expected "life" of the information.

The closest analogy in Pennsylvania cases to the type of injunction entered by the trial court here is the *Air Products* case. In *Air Products*, the court found that the defendant, a former employee of the plaintiff, had knowledge of plaintiff's trade secrets which were communicated to defendant while in a confidential relationship with plaintiff. When defendant began working for a competitor, plaintiff sought an injunction against his use or disclosure of the secrets and against his employment by the competitor. The trial court granted an injunction against use or disclosure and restrained defendant from working in certain of the competitor's operations for one year.[6] *Id.*, 442 A.2d at pp. 1115–16. In affirming the injunction, this Court opined that the injunction was warranted because it was reasonable for the trial court to conclude that it would be impossible for the employee to perform his duties as an employee of the competitor in the relevant operations without disclosing the secret information. *Id.*, at pp. 1124–25.

**6.** The injunction was granted even though the parties had not executed a restrictive covenant, although they had executed a confidentiality agreement.

Although the trial court in the instant case may have overstated the situation when it said that disclosure would be "inevitable" if Siemens purchased Midwest, we nonetheless find the injunction warranted and not overbroad. Contrary to Siemens' assertions, there was ample evidence showing at least a substantial threat that Siemens would disclose Star's information to Midwest if the acquisition were consummated. Midwest is Star's largest competitor. During the review of Star, Siemens personnel were given free rein over Star's facility and records. There was an overlap of the Siemens' personnel who conducted the review of Star's business in December, 1986, and those involved in reviewing Midwest's business earlier in the year. Siemens personnel involved in the review of Star will also be involved in the management or operation of Midwest if acquired by Siemens. We view all of this evidence as establishing a substantial likelihood that Star's information will be disclosed to Midwest if Siemens goes forward with the acquisition.

We also view the evidence as satisfactorily establishing that if this threatened disclosure is made, the injury to Star that might result therefrom could not adequately be remedied through an award of damages. This is precisely the genre of the case and the type of injury that most warrants injunctive relief. *Ecolaire, Inc. v. Crissman*, 542 F.Supp. 196, 205 (E.D.Pa.1982) (use by employee of former employer's trade secrets or confidential information is irreparable harm warranting injunctive relief.). The negative impact on Star's place in the dental handpiece market and the positive impact on Midwest's competitive position are precisely the types of harm that are not subject to exact valuation and compensation through damage awards.

Finally, we agree that the public interest, if affected at all, is better served by the entry of this injunction than by the lack of it. This decision confirms that the true public policy of Pennsylvania businesses need only make their true intentions known and reveal clearly material facts when to do otherwise will mislead the other party. They can thereby avoid the kind of sanction we approve today.

Thus, we find no error in the trial court's decision to prohibit the acquisition of Midwest, the vehicle that would make Star's information of greater value to Siemens and that would most likely present the risk of disclosure, but to limit this prohibition to a term of three years, during which the usefulness of the information can reasonably be anticipated to dissipate.

Lastly, appellants raise numerous challenges, in Issues 3 and 4, to evidentiary rulings of the trial court which they allege warrant the grant of a new trial.

Our standard of review is clear:

Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of that discretion. *Lewis v. Pruitt*, 337 Pa.Super. 419, 487 A.2d 16 (1985); *Gallegor by Gallegor v. Felder*, 329 Pa.Super. 204, 478 A.2d 34 (1984). Furthermore, not only must a clear abuse of discretion be shown, but there must be a showing that actual prejudice has occurred. *Lewis v. Mellor*, 259 Pa.Super. 509, 393 A.2d 941 (1978).

We find no reversible error in the trial court's evidentiary rulings.

■■■ The first of the challenged rulings involved certain items of evidence that were excluded at trial as hearsay. The evidence excluded and the grounds for its alleged admissibility, as asserted by Siemens on appeal, are as follows:

1. December 8, 1986 letter from Siemens to West German antitrust authority allegedly advising it that Siemens was cancelling its request for permission to acquire Midwest—allegedly admissible to show Siemens' state of mind, explain its course of conduct, or as business record, public document or prior consistent statement.

2. Handwritten note in German on December 8th letter allegedly regarding Siemens' request of antitrust authority to purchase Star—allegedly admissible as recorded contemporaneous recollection.

Both of these items of evidence were offered immediately after Mr. Behne testified on direct examination by Siemens' counsel as to the facts allegedly recorded in the documents, i.e., that in early December 1986, Siemens had cancelled its request for approval of the Midwest deal and sought approval of the Star deal. This testimony was admitted and never stricken. It was, therefore, properly before the trial court for its consideration. We find no evidence of record offered by Star to contradict these facts. Thus, we cannot see how Siemens was prejudiced by the trial court's refusal to admit the letter or handwritten note, which would have been cumulative, and Siemens has not demonstrated any prejudice to us. In fact, Siemens refers to Mr. Behne's testimony on these points in support of its arguments to us and, therefore, *sub silentio* has conceded that the record already contains competent and, we believe, uncontradicted evidence as to them. Given this, no prejudice warranting a new trial has been shown.

The next challenged ruling concerned the exclusion of portions of notes and testimony of Warshawsky, Vitt, Lerner and Buchert (all Siemens' personnel or agents) allegedly regarding their negotiations and recommendations re: Star and the information they received from Star—allegedly admissible as showing state of mind, or as prior consistent statements and recorded contemporaneous recollection. As in the case of the evidence discussed above, much of this evidence was cumulative, in that the trial court allowed substantial testimony regarding Siemens' state of mind in dealing with Star and allegations of good faith in those dealings. Siemens has not demonstrated specifically how it was prejudiced by the exclusion of the evidence and has not cited a single precedent in support of its arguments for admissibility. We find no grounds for reversal or new trial in these rulings.

Siemens also contends the trial court erred in excluding a January 6, 1987 memorandum from Mr. Lerner, Vice-President of Siemens Capital, to Mr. Behne, Executive Director of Siemens AG Dental Division, and testimony of Mr. Lerner regarding Siemens' alleged reasons for not purchasing

Star. The trial court excluded all of this as hearsay. Siemens alleges that this evidence is admissible to show state of mind, i.e., Siemens' good faith, and to explain its course of conduct. We find no reversible error on this ground. As we have already opined, the trial court received ample evidence from Siemens regarding its reasons for rejecting the Star deal. In fact, the trial court allowed Mr. Lerner himself to testify that he had communicated his views regarding the Star acquisition to other people in the Siemens organization and permitted him to state to whom the January 6th memo itself was sent. At trial, this was the limited purpose for which Siemens sought to offer the memo and Mr. Lerner's testimony regarding it. Moreover, Mr. Lerner also had testified as to the reasons why he allegedly did not favor the Star acquisition. The exclusion of further cumulative evidence was not prejudicial.

Siemens also objects to the trial court's exclusion of testimony by Mr. Lerner regarding his prior dealings with Mr. Warshawsky. Siemens sought to have Mr. Lerner testify that Mr. Warshawsky had always been meticulous in reporting to Mr. Lerner, so that if Mr. Warshawsky had discussed Midwest with Star, he would have told Mr. Lerner. Since Warshawsky did not report such conversations to Mr. Lerner, Siemens would have the court conclude that they did not take place. The trial court properly refused to allow this testimony, finding that Mr. Lerner's testimony was insufficient to demonstrate that Mr. Warshawsky's reporting habits would have included reporting this particular fact to Mr. Lerner.

Finally, Siemens objects to the trial court's receipt of certain of Star's evidence. First, Siemens alleges error in the trial court's receipt of David Vitt's testimony that he "considered" all of the information Star gave Siemens confidential. Siemens alleges this was error because whether the information was "confidential" under the terms of the Mutual Non–Disclosure Agreement was a question of law for the court. Although we agree that the interpretation of the Agreement was for the court, we find no error in the trial court's receipt of testimony pertinent to the parties'

understandings and intentions regarding Star's information. This testimony was at minimum relevant to the existence of a confidential relationship between the parties.

[26] Siemens also objects to the court's receipt of testimony of Mr. Trefz, a Star employee, regarding how the information Siemens received would enhance its ability to compete with Star. Siemens complains that Mr. Trefz is not qualified to render an opinion on this subject. Although we do not quite understand the nature of Siemens' objection, our review of the record satisfies us that Mr. Trefz was qualified to express his opinion, as a person with many years of experience in the dental handpieces business, as to the manner in which the information given to Siemens might be used by Siemens against Star. We note that the trial court limited Mr. Trefz's testimony in this regard to that relative only to those areas of Star's business with which Mr. Trefz himself was involved, and thus adequately addressed the very concern Siemens now raises.

Order affirmed. Jurisdiction is relinquished.

McEWEN, TAMILIA and POPOVICH, JJ., concur in the result.

MELINSON, J., did not participate in the disposition or consideration of this case.