J-A20033-25          2026 PA Super 17

| | | |
|---|---|---|
| TCS BLACK LABEL REALTY, LLC AND THE CONDO SHOP, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : | |
| v. | : | |
| | : | No. 3215 EDA 2024 |
| SERHANT PENNSYLVANIA, LLC D/B/A SERHANT D/B/A SERHANT SOCIETE SELECT AND RYAN SERHANT, SOCIETE SELECT, LLC, ANDREA DESY EDREI, MICHAEL ANTHONY SKOKOWSKI, JR., AND KAILEY THERESA BONDISKEY | : | |

Appeal from the Order Entered October 29, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at No(s): 230401929

BEFORE:   MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY FORD ELLIOTT, P.J.E.:          **FILED JANUARY 30, 2026**

Appellants, TCS Black Label Realty, LLC ("Black Label") and The Condo Shop, LLC ("The Condo Shop"), appeal from the order granting summary judgment in favor of Appellees, Serhant Pennsylvania, LCC ("Serhant") and Ryan Serhant (collectively "Serhant Appellees") and Andrea D. Edrei, Michael A. Skokowski, and Kailey T. Bondiskey (collectively "Edrei Appellees"). Appellants argue that the trial court erred in granting summary judgment on all seven claims asserted in their complaint. After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

This matter arises from a business dispute involving a former colleague and her prior real estate brokerage, with which she became a competitor. In 2006, The Condo Shop, a real estate brokerage, was established and has since maintained a presence in Philadelphia's real estate market. *See* MSJ Exhibit 1 (Oller Affidavit), 4/19/23, at 1.[1] The principals of The Condo Shop are Benjamin Oller, Gaurav Gambhir, and Kate Gledhill. *See* MSJ Exhibit 2 (Gambhir Deposition), 1/31/24, at 11. In 2015, Oller and Gambhir approached John Bolaris, a realtor, which led to a business partnership. *See id.* at 2. Together, they created Black Label, an affiliated brand of The Condo Shop designed to serve the luxury property market in Philadelphia and the surrounding region. *See id.*

In November 2017, Appellee, Andrea Edrei, a realtor with experience in selling luxury properties in New York City and Philadelphia, joined Black Label. *See* MSJ Exhibit 11 (Edrei Deposition), 1/17/24, at 18. Thereafter, Oller, Gambhir, Bolaris, and Edrei executed the "Black Label Operating Agreement," where Gambhir and Oller were designated manager-members and Edrei and Bolaris as members. *See* MSJ Exhibit 14 ("Black Label Operating Agreement"), 11/20/17, at 1, 17. Originally, Black Label was part of The Condo Shop, but

_____

[1] Due to the voluminous case record, all citations denoted as "MSJ" refer to the exhibits that Appellants submitted in their two responses in opposition to Appellees' motions for summary judgment. Appellants submitted the same exhibits for both responses. If an Appellee exhibit is cited, we will cite to Edrei Appellees' MSJ or Serhant Appellees' MSJ. After we introduce an exhibit number and name, we refer to subsequent citations of the exhibit name.

once Edrei joined it, it became a separate limited liability company. *See* MSJ Exhibit 6 (Gledhill Deposition), 5/6/24, at 8-10.

Edrei hired Michael Skokowski, who joined Black Label as its marketing director on August 19, 2019. *See* MSJ Exhibit 16 (Skokowski Introductory Agreement), 8/22/19, at 1; MSJ Exhibit 12 (Skokowski Deposition), 1/18/24, at 18. As marketing director, Skokowski's duties included *inter alia* creating marketing material, conducting market research, and developing digital listing content. *See* Skokowski Deposition, 1/18/24, at 31. In 2020, Skokowski obtained his real estate license, and by February 2021, he transitioned to the role of independent contractor for Black Label. *See* Skokowski Deposition, 1/18/24, at 70; MSJ Exhibit 17 ("Skokowski Agreement"), 3/15/21, at 1 (effective as of February 16, 2021).

In 2022, Kailey Bondiskey interned at Black Label, and upon her college graduation that year, she was employed by Edrei as a marketing assistant to Skokowski. *See* MSJ Exhibit 19 ("Bondiskey Agreement"), 6/23/22, at 1; MSJ Exhibit 7 (Bondiskey Deposition), 1/19/24, at 10. Bondiskey's duties included creating marketing materials, managing social media, and sending out emails. *See* Bondiskey Deposition, 1/19/24, at 49; MSJ Exhibit 21 (Emails re: Bondiskey Responsibilities List), 3/29/23, at 1. In 2022, Edrei left Black Label after a series of disagreements with the company's members. *See* Edrei Deposition, 1/17/24, at 136, 138, 148. Prior to her departure, Edrei began to explore alternative business opportunities. *See* Edrei Appellees MSJ Praecipe Exhibit A ("Edrei Declaration"), 6/25/24, at 11-12.

Since 2014, Edrei had been acquainted with Ryan Serhant, who operates a national real estate brokerage firm called Serhant. **See** Edrei Declaration, 6/25/24, at 12; MSJ Exhibit 8 (Serhant Deposition), 1/16/24, at 22. On September 30, 2022, after a real estate event where Ryan Serhant delivered a presentation, Edrei emailed him to inquire about his interest in expanding into the Philadelphia market. **See** Edrei Deposition, 1/17/24, at 163-66; Serhant Deposition, 1/16/24, at 61-62; MSJ Exhibit 15 ("Edrei/Serhant Emails, re: Serhant Philadelphia"), 9/30/22, at 1. Afterwards, Edrei decided to form her own company, Societe Select, LCC ("Societe Select"). **See** Edrei Declaration, 6/25/24, at 12.

On January 27, 2023, Ryan Serhant formed Serhant PA, LCC, and entered into an independent contractor agreement with Societe Select on March 24, 2023. **See** Edrei Declaration, 6/25/24, at 13; MSJ Exhibit 38 (Serhant and Societe Select Agreement), 3/24/23, at 1. On March 27, 2023, Edrei officially departed from Black Label but, per the Black Label Operating Agreement, is still a member. **See** MSJ Exhibit 47 (Edrei Resignation Email), 3/27/23, at 1; MSJ Exhibit 4 (Oller Deposition), 1/29/24, at 124. Around the same time, Skokowski and Bondiskey also left Black Label's employ. **See** MSJ Exhibit 45 (Skokowski Resignation Email), 3/22/23, at 1 (Skokowski stating last day will be March 31, 2023); MSJ Exhibit 48 (Bondiskey Resignation Email), 3/30/23, at 1. Shortly after leaving, Skokowski and Bondiskey joined Societe Select, taking on roles in marketing and operations. **See** MSJ Exhibit 50 (Skokowski/Serhant Independent Contractor Agreement), 4/2/23;

Bondiskey Deposition, 1/19/24, at 222 (stating she started working with Edrei and Skokowski at Societe Select in early April).

On April 19, 2023, Appellants filed their complaint along with a preliminary injunction. *See generally* Complaint, 4/19/23; Appellants' Motion for Preliminary Injunction, 4/19/23. The latter was denied after a hearing held on February 21, 2024. *See* Order (Denying Plaintiffs' Emergency Petition for Preliminary Injunction), 2/21/24, at 1 (unpaginated). In their complaint, Appellants asserted claims of: (1) breach of fiduciary duty/breach of good faith and fair dealing against Edrei; and (2) breach of contract against Skokowski and Bondiskey. *See* Complaint, 4/19/23, at 2. Against all Appellees, Appellants presented claims of: (3) conversion; (4) replevin; (5) misappropriation of trade secrets, (6) intentional interference with a contractual relationship; and (7) civil conspiracy. *See id.* Appellants seek over ten million dollars in damages. *See id.* at ¶ 3.

After a lengthy discovery period, Edrei Appellees and Serhant Appellees each filed their own respective motions for summary judgment. *See* Serhant Appellees' Motion for Summary Judgment, 6/24/24; Edrei Appellees' Motion for Summary Judgment, 6/25/24.[2] Appellants responded in opposition to both motions. *See generally* Appellants' Response in Opposition to Serhant Appellees' Motion for Summary Judgment, 7/30/24; Appellants' Response in

---

[2] Edrei Appellees also filed a praecipe to supplement their motion for summary judgment. *See* Edrei Appellees' Praecipe to Supplement Motion for Summary Judgment, 6/25/24.

Opposition to Edrei Appellees' Motion for Summary Judgment, 7/30/24. Serhant Appellees and Edrei Appellees each filed replies. **See** Serhant Appellees' Reply to Appellants' Opposition to Motion for Summary Judgment, 8/20/24; Edrei Appellees' Reply Memorandum in Further Support of the Motion for Summary Judgment of Edrei Appellees, 8/20/24.

On October 29, 2024, the trial court granted both summary judgment motions and dismissed all of Appellants' claims with prejudice. **See** Order (Granting Appellees' Motions for Summary Judgment), 10/29/24.[3] Subsequently, Appellants timely appealed pursuant to Pennsylvania Appellate Rule of Procedure 1925. **See** Notice of Appeal, 11/5/24**.** Both the trial court and Appellants complied with Pennsylvania Rule of Appellate Procedure 1925. **See** 1925(b) Order, 11/6/24; Concise Statement of Errors, 11/25/24; Trial Court Opinion, 2/13/25.

Appellants present the following questions for our review:

1. Did the [t]rial [c]ourt err in granting summary judgment to [Appellees] as to all of [Appellants'] claims on the basis that [Appellants] purportedly failed to show that they sustained any damages where [Appellants] submitted ample evidence in opposing [Appellees'] motions for summary judgment, establishing that they sustained damages due to [Appellees'] misconduct?

2. Did the [t]rial [c]ourt err in granting summary judgment to [Appellees] regarding [Appellants'] claims for conversion, replevin, and misappropriation of trade secrets where

---

[3] The trial court's order was a final order disposing claims of all parties. **See** Pa.R.A.P. 341(a).

[Appellants] submitted evidence establishing genuine issues of material fact as to each of those claims?

3. Did the [t]rial [c]ourt err in granting summary judgment to [Appellee] Edrei regarding [Appellants'] claim for breach of fiduciary duty/breach of the duty of good faith and fair dealing where [Appellants] stated a viable cause of action and submitted evidence establishing genuine issues of material fact as to that claim?

4. Did the [t]rial [c]ourt err in granting summary judgment to [Appellees] Skokowski and Bondiskey regarding [Appellants'] claim for breach of contract against them[,] where [Appellants] submitted evidence establishing genuine issues of material fact as to both of those claims?

5. Did the [t]rial [c]ourt err in granting summary judgment to [Appellees] regarding [Appellants'] claim for intentional interference with existing and prospective contractual relationships where [Appellants] submitted evidence establishing genuine issues of material fact as to that claim?

6. Did the [t]rial [c]ourt err in granting summary judgment to [Appellees] regarding [Appellants'] civil conspiracy claim where [Appellants] submitted evidence establishing genuine issues of material fact as to that claim?

Appellants' Brief at 4-6.

Throughout all six issues, Appellants request that the trial court's order granting Appellees' motions for summary judgment and dismissing Appellants' complaint with prejudice should be reversed. **See** Appellants' Brief at 9.

We review a trial court's grant of summary judgment pursuant to the following standard:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: An appellate court may reverse the entry of summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and

- 7 -

that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we review the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

Therefore, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact[-]finder. If there is evidence that would allow a fact[-]finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

***Caterpillar Fin. Servs. Corp. v. Get 'Er Done Drilling, Inc.***, 286 A.3d 302, 305-06 (Pa. Super. 2022) (citation omitted).

## 1. Damages

In their first issue, Appellants generally argue the trial court erred in granting summary judgment to Appellees on all claims, as the record demonstrates that Appellants submitted proof of actual damages resulting from Appellees' misconduct. **See** Appellants' Brief at 32; Appellants' Reply Brief at 8. Conversely, the trial court contends, throughout its Rule 1925(a) opinion, that an essential element necessary for proving all seven of Appellants' claims is damages; however, Appellants have not provided any evidence of what the damages are or, to the extent damages have been demonstrated, a causal link connecting them to Appellees' actions. **See** Trial Court Opinion, 2/13/25, at 3-10. Appellants assert that the record shows Black Label was effectively "destroyed" by Appellees' conduct, as supported by deposition testimony of Black Label principals, Oller and Gambhir, and the

- 8 -

expert report of Dr. Pete Angelides, an economist specializing in the real estate industry, who relied on both the depositional testimony and Black Label's financial record. **See** Appellants' Brief at 35; MSJ Exhibit 63 ("Angelides Report"), 5/6/24, at 1, 3 (unpaginated).[4]

Next, Appellants contend that the trial court erred in finding the Angelides Report incompetent because it lacked an adequate basis in fact. **See** Appellants' Brief at 41.[5] Contrary to the court's conclusion, they claim the Angelides Report cited compelling facts of record. **See** Appellants' Brief at 38 (citing Angelides Report, 5/6/24, at 2-4 (unpaginated) fn. 2-7); Appellants' Reply Brief at 7-8. Specifically, Appellants aver the trial court erred in stating that Dr. Angelides's report "[i]s contradicted by testimony from [Appellants'] deponents, who testified that Black Label is still in business and improving."

---

[4] Doctor Angelides provided an expert report on Black Label's financial record, which established that from 2022 to 2023, Black Label's net income had declined in comparison to its other years in business. **See** Angelides Report, 5/6/24, at 3 (unpaginated); Appellants' Reply Brief at 10 (explaining Black Label's achieved comparatively less profit in 2023).

[5] Additionally, Appellants argue, in their reply brief, that Edrei Appellees cited no authority for the proposition that Appellants were required to submit evidence, including expert testimony, to survive summary judgment. **See** Appellants' Reply Brief at 9. Appellants are correct that our Court has held that expert testimony is not required to show lost profits of a business. **See** **Jahanshahi v. Centura Development, Co., Inc.**, 816 A.2d 1179, 1184 (Pa. Super. 2003) (stating expert testimony is not necessary to establish lost profits). However, Appellants misconstrue Appellees' argument. Edrei Appellees only argue that Appellants cannot rely on expert testimony that is predicated on a false factual premise. **See** Edrei Appellees' Brief at 42. Therefore, Appellants' argument in their reply brief has no merit.

*See* Appellants' Brief at 36-37 (quoting Trial Court Opinion, 2/13/25, at 3). Appellants contend that there is no depositional testimony that Black Label's business has improved. *See id.* at 37. Moreover, Appellants argue that the trial court relied on a misleading citation by Edrei Appellees in their motion for summary judgment to Gambhir's deposition testimony. *See* Appellants' Brief at 37 (citing Gambhir Deposition, 2/5/24, at 113-15).

Appellees, in response, argue that Appellants have waived this argument concerning a misleading citation because such a contention cannot be presented for the first time on appeal. *See* Edrei Appellees' Brief at 40; Serhant Appellees' Brief at 48. Upon review of the record, we find Appellants never argued that Edrei Appellees mischaracterized Gambhir's deposition testimony in either of their filings opposing summary judgment. *Compare* Appellants' Response in Opposition to Edrei Appellees' Motion for Summary Judgment, 7/30/24, at 69-70, *with* Edrei Appellees' Motion for Summary Judgment, 6/24/24, at 25. Therefore, we find that Appellants have waived this argument. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *Beemac Trucking, LLC v. CNG Concepts, LLC*, 134 A.3d 1055, 1058 (Pa. Super. 2016) (holding argument not raised in the trial court is waived).

"Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *Bailets v.*

*Pennsylvania Turnpike Commission*, 181 A.3d 324, 336 (Pa. 2018). "It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss." *Witherspoon v. McDowell-Wright*, 241 A.3d 1182, 1188 (Pa. Super. 2020) (quoting *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1258 (Pa. Super. 1983)). "[T]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount but deals with the more basic question of whether there are identifiable damages[;] thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Logan v. Mirror Printing Co. of Altoona*, 600 A.2d 225, 227 (Pa. Super. 1991) (citation omitted). Additionally, we recognize that expert testimony is incompetent if it lacks a basis in adequate fact. *See Viener v. Jacobs*, 834 A.2d 546, 558 (Pa. Super. 2003) (citations omitted) ("[E]xpert testimony cannot be based solely upon conjecture or surmise. Rather, [an expert's] assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.").

After thoroughly reviewing the record, we agree with the trial court that the Angelides Report is grounded in speculation and not fact. *See* Trial Court Opinion, 2/13/25, at 3. The Angelides Report "**assumes** that the actions of [Appellees] did destroy the ability of Black Label to earn profits." Angelides Report, 5/6/24, at 4 (unpaginated; emphasis added). The report further states that "**assuming** [Appellants'] actions fully devalued Black Label's ability to

earn profits, the damages would be 2 million to 4.2 million." *Id*. at 7 (unpaginated; emphasis added). However, we find that the expert report is not factually grounded. *See* Oller Deposition, 1/29/24, at 189 ("Black Label is still in business. It's not at the same capacity as it was. Black Label is more of a name."); Gambhir Deposition, 1/31/24, at 294 ("Yeah [Black Label] is still in business.").[6] The Angelides Report relies on deponent testimony and Appellants' complaint, but these two sources merely explain the facts of the case. *See* Oller Deposition, 2/5/24, at 151-52 (stating there was correspondence between Serhant Appellees and Edrei Appellees), 281-82 (explaining Black Label real estate agents are independent affiliates); Gambhir Deposition, 1/31/24, at 209-10 (Edrei joined Black Label in 2017) and 284 (stating Black Label made profit for two years); Complaint, 4/19/23, at ¶ 1-3 (introduction section).

Absent the expert report, Appellants do not cite to *any* evidence that shows a calculation of damages, grounded in fact, that Appellees allegedly caused for each cause of action. *See Witherspoon*, *supra*. In fact, in their responses in opposition to Appellees' motions for summary judgment, Appellants repeatedly state they had "sustained damages in the millions of

---

[6] *See also* Oller Deposition, 1/29/24, at 209 (Q: "…[Black Label] is still currently an active team in business, correct? A: Yes. Yes.") and 215 (stating Appellants recently sold licensing agreement for Black Label name to small San Diego realtor team).

dollars" due to Appellees' conduct and cited the same depositional testimony of Oller and Gambhir. ***See*** Appellants' Response in Opposition to Serhant Appellees' Motion for Summary Judgment, 7/30/24, at 32-33, 59, 67, 73, 78, 86, 101-03, and 105; Appellants' Response in Opposition to Edrei Appellees' Motion for Summary Judgment, 7/30/24, at 2, 5, 7, 66, 69, 70-72, 87, 91, 116 (both citing Gambhir Deposition, 2/6/24, at 116-19 and Oller Deposition, 2/6/4, at 435-39). We find that Appellants' expert did not articulate the damages in a legally cognizable manner, as his opinion was not based on facts, but rather assumed facts not in the record, nor did Appellants articulate how any of their claims associate actual damages with Appellees' alleged conduct. Accordingly, Appellants' first claim fails.

## 2. Misappropriation of Trade Secrets, Conversion, and Replevin

In their second issue, Appellants argue that the trial court erred in granting summary judgment for their claims for misappropriation of trade secrets, conversion, and replevin because they established genuine issues of material fact as to each of the claims. ***See*** Appellants' Brief at 42.

*Misappropriation of Trade Secrets*

First, we evaluate Appellants' claim for misappropriation of trade secrets. ***See id.*** at 43. Specifically, Appellants argue that Appellees misappropriated Black Label's "Constant Contacts" database, social media accounts, and marketing materials. ***See id.***

Appellants contend that Appellees misappropriated Black Label's trade secret, the Constant Contacts client database. *See* Appellants' Brief at 43-44.[7] Appellants maintain that Black Label's Constant Contact database is a trade secret because it was password protected and contained confidential information, which was compiled over several years at a considerable expense. *See* Appellants' Brief at 44, 46; Appellants' Reply Brief at 20-21 (citing *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa. Super. 2000) (explaining customer lists and information are valuable investments of employers' time and money; this data is confidential, a key business asset, and is considered a "trade secret" that employers can protect, even without a non-disclosure contract)).

Appellants allege that Edrei and Skokowski specifically misappropriated Black Label's Constant Contact database when they left and closed the database account, cutting off Black Label's access. *See* Appellants' Brief at 46. They further contend that Serhant Appellees provided the support needed for Edrei Appellees to use this confidential data at Societe Select. *See id.* Even though Black Label recovered "a portion" of contacts, many were lost. *See id.*; MSJ Exhibit 22 (Black Label Constant Contact Database) (listing all Constant Contact database individuals). Therefore, they assert, the trial court made a reversible error by disregarding this evidence and concluding that

---

[7] The Constant Contacts database is a third-party electronic mail platform that stores an individual's contact information and sends marketing materials to each contact, as directed. *See* Gledhill Deposition, 5/6/24, at 204-05.

Appellants did not have enough proof to support their claim of trade secret misappropriation. **See** Appellants' Brief at 47.

Also, Appellants contend Appellees misappropriated Black Label's social media accounts, rebranded them, and deleted years of marketing content from both Facebook and Instagram. **See** Appellants' Brief at 47-48 (stating Appellees took Black Label's social media accounts and rebranded them for Societe Select). While Appellees eventually returned Black Label's Facebook account, substantial content was deleted, resulting in the loss of significant marketing efforts. **See id.** at 49. Furthermore, Appellants argue that Appellees did not return Black Label's Instagram account, which contained years of cultivated content. **See id.** at 49-50 (stating Black Label spent thousands developing Instagram account posts).

Finally, Appellants maintain Appellees misappropriated Black Label's marketing materials, including redirecting "philadelphiapenthouse.com" (the "marketing website") to Societe Select and failing to return marketing templates. **See** Appellants' Brief at 51. Appellants claim that the trial court misstated that the marketing website had been returned to them when in fact it never was. **See id.** (citing Trial Court Opinion, 2/13/25, at 4 ("It is undisputed that the URL [Uniform Resource Locator or web address] has been returned to [Appellants], and once again, they have not articulated the

damages caused by this loss.")).[8] Further, Edrei Appellees took all Black Label's marketing materials and failed to return "nearly" all of them. ***See id.*** at 52. Therefore, Appellants allege that the trial court failed to consider ample evidence of Appellees' misappropriation of Black Label's social media, the marketing website, and marketing materials and erred in granting summary judgment for Appellees. ***See id.*** at 51-52.

Under the Pennsylvania Uniform Trade Secret Act ("PUTSA"), a "trade secret" is:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[; and]
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S. § 5302.

---

[8] We note that the trial court was incorrect that Appellants were given back control of the marketing website. However, we hold that the trial court's misstatement amounts to harmless error. ***See Interest of J.M.G.***, 229 A.3d 571, 581 (Pa. Super. 2020) ("[T]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial court error was harmless beyond a reasonable doubt.") (citation omitted). Appellants have failed to provide any evidence other than deposition-based testimony that Edrei Appellees still have the marketing website. Accordingly, we find this argument meritless.

To establish misappropriation of a trade secret, Appellants are required to show "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F.Supp.3d 491, 500 (E.D. Pa. 2021) (applying Pennsylvania law).[9] Under the PUTSA, a plaintiff can recover damages from the "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 12 Pa.C.S. § 5304(a). Nevertheless, "one cannot be held liable for damages for misappropriation of a trade secret without proof of actual harm through past use or disclosure[.]" *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. 1989) (*en banc*).

First, we find that Appellants' argument regarding Serhant Appellees' involvement in misappropriating alleged trade secrets, including Black Label's Constant Contact database, marketing materials, and social media accounts, is predicated on pure speculation. *See Swatt v. Nottingham Village*, 342 A.3d 23, 36 (Pa. Super. 2025) ("A plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in [the plaintiff's] favor.") (citation omitted). The record is replete with admissions from Black

---

[9] While decisions from federal district courts are not binding on this Court, we may rely on them for persuasive authority. *See EMC Mortgage, LLC v. Biddle*, 114 A.3d 1057, 1064 n.6 (Pa. Super. 2015).

Label principals that they have no actual evidence of Serhant Appellees' involvement.[10] Moreover, the Serhant director of operations, Renee Fitzgerald, confirmed in her testimony that Serhant does not use Constant Contact. **See** MSJ Exhibit 10 (Fitzgerald Deposition), 4/24/24, at 74. Additionally, Societe Select, in their agreement with Serhant agreed to only use marketing materials with Serhant branding, providing further evidence of Serhant Appellees' non-involvement with Black Label materials. **See** Serhant and Societe Select Agreement, 3/24/23, at 3 (stating Societe Select shall adhere to Serhant's marketing guidelines). Therefore, we find that the trial court properly granted summary judgment for Serhant Appellees because Appellants failed to demonstrate a genuine dispute of material fact that Serhant Appellees were involved in the misappropriation of trade secrets.

---

[10] **See** Oller Deposition, 1/29/24, at 93-94 ("Q: [W]hat did [Ryan] Serhant do to delete your confidential and proprietary information? Oller: I don't know what he did[,] and I don't know what he didn't do… Q: So you have no facts to establish that was [Ryan] Serhant? Oller: I do not."); Gambhir Deposition, 1/31/24, at 29-30. ("Q: What facts do you [] possess to demonstrate that [Serhant Appellees] sabotaged, disrupted or interfered with [Appellants'] social media? … Gambhir: There are discussions being had between [Edrei, Skokowski, and Serhant Appellees.] Ryan Serhant has an email directing [Edrei] through his [employees] to help with the transition. They meet with the transition team and then a few weeks later we lose our data … From that, from all the planning that happened that has been proven to the outcome that has been proven. What happened between Serhant and [Edrei], I don't know.") and 34 ([Gambhir talking about Serhant Appellees and speculatively indicating that they participated in taking alleged trade secrets]: "I have not seen a direct email or conversation purely asking [about] the database, but there has—the emails is a cumulative conversation about the transition of the whole team and company…").

Next, we analyze Appellants' argument as to the Edrei Appellees.[11] Upon review of the record, we agree with the trial court's finding that Appellants' Constant Contact database was never taken or deleted by Edrei Appellees; rather, Appellee Skokowski, while working for Black Label, let the database expire because Gambhir told him to. *See* Skokowski Deposition, 1/18/24, at 535-55 (explaining Constant Contact database was expensive and only Edrei used it).[12] Black Label nevertheless reactivated the account on March 27, 2025. *See* Edrei Appellees' MSJ Exhibit 16 (Constant Contact Reactivation Email), 3/27/25, at 1 (stating new login from different device).

_____

[11] We acknowledge there is conflicting testimony as to whether Black Label's Constant Contacts database may be considered a trade secret. ***Compare*** Oller Declaration, 4/19/23, at 10-12 (stating Constant Contact database was passcode protected); Gambhir Deposition, 2/5/24, at 164 (stating Constant Contact database held confidential information) ***with*** Skokowski Deposition, 1/18/24, at 23 ("Nothing was ever marked as confidential."); Edrei Deposition, 1/17/24, at 52 ("…[The Constant Contact database] wasn't a whole list of clients. It was mostly, I would stay, probably 99 percent of realtors."). Although the trial court did not adjudicate this specific point of contention, we find that regardless of whether Black Label's Constant Contacts database constitutes a trade secret, a claim predicated thereon still fails because Appellants have failed to prove that Edrei Appellees misappropriated the information or that they caused actual damage. ***See Den-Tal-Ez, Inc.***, 566 A.2d at 1232.

[12] ***See also*** Edrei Appellees MSJ Exhibit 15 (Constant Contact Email), 3/4/23, at 1 (the company running the Constant Contact database confirming Black Label's account was cancelled and 120 days remained to reactivate); Gambhir Deposition, 1/31/24, at 169 ("Q: Did there come a time in the course of your work at Black Label when you stopped using the Constant Contact program? A: Yes. There was at some point, the subscription ended or was going to end.").

Moreover, Oller and Gambhir, in both of their depositions, could not identify how many contacts, if any, had been removed from the database. *See* Gambhir Deposition, 1/31/24, at 139 ("That's exactly what I'm saying, even today. I don't know what contacts are deleted.").[13] Additionally, at the preliminary injunction hearing on February 21, 2024, the trial court explicitly recognized that Appellants owned and controlled the Constant Contact database and were unable to determine if any information was deleted. *See* N.T. Preliminary Hearing, 2/21/24, at 63. Accordingly, Appellants have failed to prove that Edrei Appellees caused any damages, even if they possessed and utilized the Black Label Constant Contact database. *See Den-Tal-Ez, Inc.*, 566 A.2d at 1232.

Furthermore, we reject Appellants' claim that Edrei Appellees misappropriated Black Label's social media accounts. Here, the company's social media platforms are, by their marketing nature, designed to be universally accessible. Such information is not secret, and the PUTSA extends protection *only* to information kept confidential through reasonable efforts. *See* 12 Pa.C.S. § 5302(1). Indeed, Appellants' characterization of Black Label's social media accounts as "trade secrets" is unsupported and meritless.

_____

[13] *See also* Gambhir Deposition, 1/31/24, at 316-17 ("We were given back whatever was retrieved after the [Constant Contact database] account had expired and cancelled. We are not aware of all the information that was there."); Oller Deposition, 1/29/24, at 158 ("Presently I have access to a Constant Contact [database] account, which was owned by Black Label. I do not know to the extent of what was removed from it as of now.").

Moreover, Appellants fail to illuminate exactly what marketing materials Edrei Appellees took. **See** Gambhir Deposition, 2/5/24, at 26 ("It is impossible to create a list of every [marketing] document in the last seven years."). Accordingly, we find Appellants' contention that Edrei Appellees misappropriated the alleged trade secrets of Black Label's marketing materials meritless.

*Conversion and Replevin*

Appellants argue that Appellees wrongly took, and still possess, Black Label's Constant Contact database, social media pages, marketing materials, and a marketing website. **See** Appellants' Brief at 53. They argue the trial court overlooked the evidence submitted, which showed that genuine issues of material fact exist as to Appellants' claims for conversion or replevin. **See id.**

First, Appellants contend that Appellees took Black Label's Constant Contact database, and Edrei Appellees secretly discontinued the database before they left, leaving Black Label without the database. **See** Appellants' Brief at 55. Second, Appellants allege that the Constant Contact database is now being used by all Appellees at Societe Select. **See id.** Third, Appellants assert that the loss of the database was devastating and caused actual damage. **See id.** at 56. Like their misappropriation of trade secrets argument, Appellants maintain that the trial court improperly discounted all this evidence on the basis that Appellants' witnesses "cannot say with certainty what is

- 21 -

missing, or if anything is" from the Constant Contact database. Appellants' Brief at 55-56 (quoting Trial Court Opinion, 2/13/25, at 4).

Next, Appellants claim that they submitted ample evidence showing that Appellees, Edrei and Skokowski, took and still possess Black Label's Instagram account. *See* Appellants' Brief at 57. Appellees allegedly never returned Black Label's Instagram account, which cost thousands of dollars for Appellants to develop. *See id.* Similar to above, Appellants argue they submitted evidence showing that, upon leaving Black Label, Appellees took the marketing website which it specifically created and maintained for its client, The Ritz Carlton Philadelphia. *See* Appellants' Brief at 58. Furthermore, Appellants maintain that the trial court erred in holding that the marketing website had been returned and that Appellants failed to articulate damages. *See id.* at 58 (citing Trial Court Opinion, 2/13/25, at 4).

Appellants additionally contend they have submitted evidence showing that Edrei Appellees left Black Label with thousands of Black Label digital marketing templates, which Black Label had utilized to market properties to clients. *See* Appellants' Brief at 59. Finally, Appellants argue that Appellees have failed to return nearly all confidential and proprietary marketing templates. *See id.* at 50.

"Pursuant to Pennsylvania case law, a conversion is widely understood as 'the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and

without lawful justification.'" ***PTSI, Inc. v. Haley***, 71 A.3d 304, 314 (Pa. Super. 2013) (quoting ***McKeeman v. Corestates Bank, N.A***., 751 A.2d 655, 659 n.3 (Pa. Super. 2000)); ***see also*** Restatement of Torts § 222A (1965).

"Replevin is an action to regain possession of property." ***Barlett v. Demich***, 307 A.3d 736, 741 (Pa. Super. 2023). To successfully recover property in a replevin action, "it is incumbent on the plaintiff to show not only that he has title, but that he has also the right of immediate possession." ***Int'l. Electrs. Co. v. N.S.T. Metal Prods. Co.***, 88 A.2d 40, 42 (Pa. 1952).

Tangible property refers to items that can be physically felt or touched, while intangible property refers to items that do not have physical substance. ***In re Macfarlane's Estate***, 459 A.2d 1289, 1292 (Pa. Super. 1983). Our Court has traditionally recognized that only tangible property is recoverable for actions of replevin or conversion. ***See Northcraft v. Edward C. Michener Assocs., Inc.***, 466 A.2d 620, 624-25 (Pa. Super. 1983) (citing Prosser, Torts § 15 at 82-83 (4th ed. 1971)). While courts in other states have expanded the tort of conversion to apply to intangible property, our Court has noted that "[t]he process of expansion has stopped with the kind of intangible rights which are customarily merged in or identified with some document." ***Northcraft***, 466 A.2d at 625. For example, items such as stock certificates and deeds are recoverable in replevin and conversion actions. ***See id.*** Courts applying Pennsylvania law have considered digital property interests but have consistently found that these interests are unable to support a conversion or

replevin claim. *See Peruto v. Roc Nation*, 386 F.Supp.3d 471, 476 (E.D. Pa. 2019) (holding computer data and digital files were property interests not subject to replevin under Pennsylvania law); *Eagle v. Morgan*, No. 11-CV-4303, 2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013) (dismissing claim for conversion of LinkedIn account); *Famology.com Inc. v. Perot Sys. Corp.*, 158 F.Supp.2d 589, 692 (E.D. Pa. 2001) (rejecting claim for conversion of internet domain names).[14]

Like our misappropriation of trade secrets analysis above, Appellants have failed to provide evidence that Serhant Appellees were involved in taking or using Black Label's marketing materials, the Constant Contact database, Instagram account, and digital marketing materials. Accordingly, we find that the trial court properly granted summary judgment for Serhant Appellees in relation to Appellants' cause of action for replevin and conversion.

As to Appellants' replevin claim against Edrei Appellees, all four property categories that Appellants identify—the Constant Contact Database, Instagram account, digital marketing materials, and marketing website—fail

_____

[14] Federal courts applying Pennsylvania law have found that conversion can be applied if intangible property is considered a trade secret. *See Teva Pharmaceuticals USA, Inc. v. Sandhu*, 291 F.Supp.3d 659, 680 (E.D. Pa. 2018) ("[T]rade secrets are treated as convertible property under Pennsylvania law.") (citing *Gladstone Tech., Partners, LLC v. Dahl*, 222 F.Supp.3d 432, 441 (E.D. Pa. 2004)). However, Pennsylvania courts have continued to limit conversion claims to intangible rights to property unless merged or identifiable in a visible document. *See Northcraft*, 466 A.2d at 625.

as a matter of law because replevin is only recognized as applicable to tangible property, not for intangible property. An action for replevin cannot be maintained unless actual and constructive possession exists. **See Winner v. Messinger**, 69 A.2d 172, 174 (Pa. Super. 1949). All of Appellants' property allegedly subject to this claim is  intangible, and therefore, Appellants cannot establish a cause of action. **See Peruto**, 386 F.Supp.3d at 476. Moreover, as explained in more detail below, Appellants fail to articulate damages. Accordingly, Appellants' replevin claim has no merit, and the trial court did not err in granting summary judgment for replevin against Edrei Appellees.

Next, we evaluate Appellants' conversion claim. Appellants fail to cite any compelling case law recognizing conversion as a viable cause of action for its Constant Contact database, marketing website, social media account, or digital marketing materials. These items are intangible digital property as they are not made of a "physical substance." **Macfarlane's Estate**, 459 A.2d at 1292. Furthermore, several federal courts applying Pennsylvania law have specifically held that a domain name and social media account were not subject to conversion. **See Farmology.com Inc.**, 158 F.Supp.2d at 592; **Eagle**, 2013 WL 943350, at *10. We agree with the conclusion of the federal courts in these decisions.

Even if we found that these items could support conversion as a cause of action, Appellants have failed to adduce sufficient evidence that Appellees caused any actual damage to Black Label regarding the Constant Contact

database, social media, marketing materials, and the marketing website. **See**

**PTSI Inc.**, 71 A.3d at 314 (holding plaintiff's conversion claim failed because

materials were returned). Hence, the trial court did not abuse its discretion or

commit an error of law in granting summary judgment in favor of all Appellees

on Appellants' conversion and replevin claims.

**3. Breach of Fiduciary Duty and The Duty of Good Faith and Fair Dealing**

In their third issue, Appellants contend that the trial court erred by

dismissing their claim against Appellee Edrei for breach of fiduciary duty and

the duty of good faith and fair dealing. **See** Appellants' Brief at 60; Appellants'

Reply Brief at 34-36. The trial court ruled in Appellee Edrei's favor because

the misappropriation claim was dismissed, the Black Label Operating

Agreement allowed competition, and Edrei was considered a member of Black

Label, not a manager. **See** Trial Court Opinion, 2/13/25, at 6-7. Appellants

argue these findings are incorrect, emphasizing that substantial evidence

showed Edrei acted as managing partner of Black Label, owed fiduciary duties,

and breached those duties by soliciting Black Label's clients, agents, and

employees to join her competing business. **See** Appellants' Brief at 60-61, 66-

67.

Appellants maintain that our Court has recognized that, in the context

of a limited liability company such as Black Label, even members who are

acting solely in a non-managerial capacity may breach a duty of good faith or

breach a fiduciary duty. **See** Appellants' Brief at 62 (citing **Retina Assocs. of**

***Greater Philadelphia, Ltd. v. Retinovitreous Assocs., Ltd.***, 176 A.3d 263, 274, 277 (Pa. Super. 2017). Relying on ***Retina Associates***, Appellants emphasize that "[w]hether or not a member is involved in management, the member has no right to appropriate property belonging to the [limited liability company] for personal use." Appellants' Brief at 63 (quoting ***Retina Assocs.***, 176 A.3d at 277). Here, Appellants argue Appellee Edrei was not a passive member, but Black Label's managing partner, responsible for daily operations such as marketing, social media, branding, managing real estate agents, and client services. ***See*** Appellants' Brief at 66-67. Boiled down, since Appellee Edrei "engag[ed] in control transactions [and acted] in some capacity other than merely a member," Appellants assert that she owed a fiduciary duty to Black Label as well as a duty of good faith and fair dealing. Appellants' Brief at 66 (quoting ***Retina Assocs.***, 176 A.3d at 274).

Furthermore, Appellants argue that Appellee Edrei may have had a right to leave Black Label to join a competing real estate brokerage, but she was never permitted by the Black Label Operating Agreement to allegedly "poach [Black Label's] clients, personnel, confidential information, social media, marketing website, and marketing materials, while destroying [Black Label's] ability to do business." Appellants' Brief at 67. For these reasons, Appellants submit that the trial court's dismissal of their breach of fiduciary duty and duty of good faith and fair dealing against Edrei was an error and should be reversed. ***See id.*** We find no relief is due.

We review Appellants' argument that Appellee Edrei breached a duty of good faith and fair dealing. The trial court dismissed Appellants' claim, finding that Pennsylvania does not recognize a standalone cause of action for breach of the covenant of good faith and fair dealing. **See** Trial Court Opinion, 2/13/25, at 6-7 (citing **McCabe v. Marywood University**, 166 A.3d 1257 (Pa. Super. 2017)). While the trial court's statement is correct in isolation, it fails to account for the Pennsylvania statutory framework governing limited liability companies.

The Pennsylvania Uniform Limited Liability Company Act of 2016 ("PULLCA") imposes a contractual obligation of good faith and fair dealing among members and managers. **See** 15 Pa.C.S. §§ 8849.1(d) and 8849.2(d). Thus, while we agree that Pennsylvania law does not permit an independent common law action for a breach of the covenant of good faith and fair dealing, the PULLCA incorporates that obligation as a potential contractual duty among both managers and members of the limited liability company. We find that Appellants can bring a claim of good faith and fair dealing as a contractual obligation under the PULLCA.[15] Our Court has not yet defined what the

---

[15] This case is different from **Hanaway v. Parkesburg Group, LP**, where our Supreme Court held that a duty of good faith and fair dealing did not exist because there was no duty of good faith under statutory law applicable to limited partnership agreements at the time of the agreement. **See** 168 A.3d 146, 158 (Pa. 2017). Here, the PULLCA specifically implies that a duty of good faith and fair dealing is implied unless the operating agreement for a limited liability company says otherwise for both members and managers. **See** 15 Pa.C.S. §§ 8849.1(d) and 8849.2(d).

contractual obligation of good faith and fair dealing is. Nevertheless, we find

Section 8849.1's comment persuasive, which defines the contractual

obligation of good faith and fair dealing of Section 8849.1(d) as follows:

> [S]ubsection [d] refers to the "contractual obligation of good faith and fair dealing" [] and thereby invokes the implied obligation that exists in every contract. [*See*] Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").
>
> …To the contrary, the contractual obligation of good faith and fair dealing is not a fiduciary duty, does not command altruism or self-abnegation, and does not prevent a partner from acting in the partner's own self-interest:
>
> "Fair dealing" is not akin to the fair process component of entire fairness, i.e., whether the fiduciary acted fairly when engaging in the challenged transaction as measured by duties of loyalty and care. … It is rather a commitment to deal "fairly" in the sense of consistently with the terms of the parties' agreement and its purpose. Likewise[,] "good faith" does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract. Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.

15 Pa.C.S. § 8849.1, comment (citing (***Gerber v. Enter. Products Holdings, LLC***, 67 A.3d 400, 418-19 (Del. 2013) (quoting ***ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC***, 50 A.3d 434, 440-42 (Del. Ch. 2012), ***aff'd in part***, ***rev'd in part on other grounds***, 68 A.3d 665 (Del. 2013)) (footnotes, citations, and internal quotations omitted without ellipsis by ***Gerber***)).

Applying the above-quoted PULLCA comment to the present matter, we must look at the Black Label Operating Agreement to decide whether Appellee Edrei breached a duty of good faith and fair dealing.

Instantly, Section 11 of the Black Label Operating Agreement *expressly* entitles Appellee Edrei, as a member, to participate in endeavors that are inherently in competition with Appellant:

> Any Member may engage in other business ventures of *every nature*. Neither the Company nor any of the other Members shall have any right or interest in such independent ventures or to the income and profits derived from.

Black Label Operating Agreement, 11/20/17, at 19 (emphasis added).

Looking to the Black Label Operating Agreement, the trial court is correct that it expressly establishes that Appellee Edrei is free to lawfully compete. **See** Trial Court Opinion, 2/13/25, at 7. There is nothing in the agreement that precludes Appellee Edrei from leaving Black Label and creating her own competing brokerage. **See** Black Label Operating Agreement, 11/20/17, at 19. Moreover, Appellants fail to offer an argument to the contrary and instead focus on Appellee Edrei's breach of alleged fiduciary duty. **See** Appellants' Reply Brief at 34-36.

To establish a claim of breach of a fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) that the defendant negligently or intentionally failed to act in good faith and solely for the plaintiff's benefit; and (3) that the plaintiff suffered an injury caused by the defendant's breach of fiduciary duty. **See**

*Spinelli by Morris v. Fallon*, 322 A.3d 956, 964-65, (Pa. Super. 2024) (citation omitted). Further, Appellants rely heavily on *Retina Associates* to support their contention that Appellee Edrei was a managing partner of Black Label; however, we find the facts distinguishable from this case.

In *Retina Associates*, this Court considered whether a trial court erred by dismissing the plaintiff's breach of fiduciary duty claim based on the facts of the amended complaint. *See Retina Assocs.*, 263 A.3d at 271. Our Court found that managing members of a medical practice LLC may have breached fiduciary duties by using the company's property and goodwill to establish a competing practice. *See Retina Assocs.*, 263 A.3d at 271. However, *Retina Associates* was decided under the Pennsylvania Limited Liability Company Law of 1994 ("PLLCL"), which did not expressly delineate the fiduciary obligations of members and managers. *See Retina Assocs.*, 186 A.3d at 271, fn. 4.

Instantly, the Black Label Operating Agreement was entered into on November 20, 2017, which means that the PULLCA governs. *See* Black Label Operating Agreement, 11/20/17, at 22; 15 Pa.C.S. § 8811(c) (PULLCA governs after April 1, 2017). Further, the Black Label Operating Agreement expressly states that Oller and Gambhir are the only two managing members of Black Label. *See* Black Label Operating Agreement, 11/20/17, at 17.

Although Appellee Edrei assisted in daily operations, administrative participation does not equate to managerial authority under the Black Label Operating Agreement. *See id.* Appellants conflate Edrei's operational

involvement as a manager with fiduciary duty; there is nothing in the record to show that Edrei misused Black Label assets or exploited company property like defendants in **Retina Associates**. Her conduct, competing in other business affairs, was contractually lawful. **See PTSI, Inc.**, 71 A.3d at 312 (finding plaintiff's status of manager does not necessarily subject one to a fiduciary duty owed). As we also detailed above, Appellants also failed to establish that any Appellees misappropriated trade secrets or committed the torts of replevin and conversion. Accordingly, the trial court properly entered summary judgment for Appellants' claim of breach of fiduciary duty.

## 4. Breach of Contract

In their fourth issue, Appellants challenge the dismissal of its breach of contract claim against Appellees, Skokowski and Bondiskey. **See** Appellants' Brief at 68-73; Appellants' Reply Brief at 37-38. Appellants argue that Skokowski breached paragraph 16, a confidentiality provision, of his agreement with Black Label by using confidential information for his benefit and sharing it with Serhant Appellees. **See** Appellants' Brief at 69 (citing Skokowski Agreement, 2/16/21, at 5-6). Appellants argue that they submitted ample evidence proving Skokowski allegedly breached this confidentiality provision by: (1) misappropriating Black Label's confidential and proprietary information; and (2) deleting "large amounts" of Black Label emails upon his departure. **See** Appellants' Brief at 70. A breach of this provision is explicitly considered a material violation of the agreement, and, according to

Appellants, Skokowski's breach caused them millions of dollars in damages. *See id.*

Next, Appellants contend that Bondiskey breached multiple provisions of her employment and confidentiality agreements. *See* Appellants' Brief at 73. Specifically, Appellants point to paragraph eight of the Bondiskey Agreement, which defined confidential information and prohibited Bondiskey from disseminating any such information. *See* Appellants' Brief at 70-71 (citing Bondiskey Agreement, 6/23/22, at 5). Additionally, Bondiskey agreed not to solicit or divert any investors or business contacts with whom the employer or its affiliates had conducted business. *See id.* at 71-72 (citing Bondiskey Agreement, 6/23/22, at 6).

Finally, Bondiskey also signed a separate agreement entitled "Non-Competition and Confidentiality Agreement," where she agreed that she could not directly or indirectly solicit any protected clients for a period of three years after her separation from Appellants. *See id.* at 72; MSJ Exhibit 20 (Bondiskey Confidentiality Agreement), 6/23/22, at 1 (defining protected clients as individuals that employees specifically provided services to while employed at Black Label). Appellants argue the record contains ample evidence establishing that Bondiskey breached these provisions of her employee agreements with Appellants by: (1) misappropriating Black Label's confidential and proprietary information, its Constant Contact client database, social media accounts, marketing website, and marketing templates; and (2) deleting many Black Label emails upon her departure. *See* Appellants' Brief

at 72-73. Appellants aver that Bondiskey's breach cost millions of dollars of damage and therefore the trial court's holding was clearly erroneous. *See id.* at 73. No relief is due.

It is well established that to maintain a cause of action for breach of contract, the plaintiff must establish (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resultant damages. *See Rice Drilling B, LLC v. Scott*, 325 A.3d 663, 671 (Pa. Super. 2024) (citation omitted). "Resultant damages" are those "damages suffered from breach." *412 N. Front St. Assocs., LP, v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. 2016) (quoting *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010)). "As a general rule, damages are not recoverable if they are too speculative, vague[,] or contingent[,] and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Fam. Mrt., Inc.*, 98 A.3d 645, 661 (Pa. Super. 2014) (*en banc*) (citation omitted).

Upon review, we conclude the trial court properly granted summary judgment in favor of Appellees Skokowski and Bondiskey on Appellants' breach of contract claim. Although Appellants allege that Skokowski and Bondiskey violated confidentiality and non-solicitation provisions of their respective agreements, the record is devoid of any evidence establishing a causal link between these alleged breaches and any resultant damages. *See Newman Dev. Grp. of Pottstown, LLC*, 98 A.3d at 661 ("damages in a

breach of contract must be proved with a reasonable certainty. Otherwise, they are generally not recoverable") (emphasis added).[16] As detailed above, we found that Appellants failed to prove that any of Appellees had a hand in misappropriating Black Label's trade secrets and that Appellants failed to establish conversion and replevin as a cause of action.

Further, Appellants fail to point to anything in the record that proves Appellees, Skokowski or Bondiskey, deleted any emails when they left Black Label. The emails cited by Appellants are emails between Serhant employees and Skokowski, and the trial court found that these emails did not support a breach of contract or show any actual damage to Appellants. *See* Trial Court Opinion, 2/13/25, at 8. Therefore, Appellants' fourth issue is meritless.

## 5. Intentional Interference with Contractual Relationships

In their fifth issue, Appellants argue that they put forth sufficient evidence to support their claims against Appellees for intentional interference with contractual relationships. *See* Appellants' Brief at 75. Specifically,

---

[16] We agree with the trial court that the emails cited by Appellants as evidence of Appellees Skokowski and Bondiskey's breach of contract are grounded in speculation. *See* Trial Court Opinion, 2/13/25, at 8; *see also* MSJ Exhibit 32 (Re: Marketing for Societe + X Serhant), 1/23/23, at 1 (talking about logos for Societe Select); MSJ Exhibit 33 (Re: Launch of Philadelphia Metro Serhant Videos), 1/20/23, at 1-2 (email about Ryan Serhant touring Edrei's property listings); MSJ Exhibit 40 (Skokowski Email), 2/2/23, 1-2 (email stating sellers and long-time clients interested in setting up video call with Ryan Serhant and Serhant team); MSJ Exhibit 41, 2/8/23, at 2 (Re: Thank You) (Serhant in email asking "How did I do?" responding to Skokowski, who said "delivering thoughtful information to them").

Appellants contend that Appellees deliberately interfered with Black Label's staff and client relationships, particularly those who moved to work or list properties with Societe Select. ***See id.*** Appellants purport to raise claims under both theories relating to existing and prospective contractual relationships. ***See id.*** Nevertheless, Appellants are not entitled to relief.

First, Appellants argue that Appellees tortiously interfered with existing and prospective contractual relations with Black Label's clients. ***See*** Appellants' Brief at 75. They argue that they put forward evidence that shows Appellees improperly solicited clients to terminate their exclusive real estate listing agreements with Black Label and relist their properties with Societe Select. ***See id.*** at 76; Appellants' Reply Brief at 28-29.[17] Appellants aver they still have active listings with other clients that Appellees also solicited to leave Black Label. ***See*** Appellants' Brief at 76, n. 3 ("Although the [e]xclusive listing agreements with these clients had expired by this point, Black Label continued to maintain active listings for them."); Appellants' Reply Brief at 29. Therefore, contrary to the trial court's decision, Appellants assert that they provided substantial evidence that Appellees tortiously interfered with their existing and prospective client relationships. ***See*** Appellants' Brief at 80.

Next, Appellants argue that the trial court incorrectly held that Appellees did not tortiously interfere with Black Label's employees and agents' contracts

---

[17] Exclusive listings agreements allow real estate agents to be the exclusive agent for a particular listing. ***See*** 42 Pa. Code § 35.332.

because Appellants allegedly supplied ample evidence establishing that Appellees intentionally and improperly interfered with Black Label's employee contractual relationships. *See* Appellants' Brief at 81-83. Appellants cite our Supreme Court's recent decision in *Salsberg v. Mann* for the proposition that an individual can tortiously interfere with an at-will employment contract. *See* Appellants' Brief at 81 (quoting *Salsberg*, 310 A.3d 104, 120 (Pa. 2024) ("recognition of a claim for intentional interference with an existing at-will employment contract or relationship against a third party to the relationship not only is consistent with—and a logical application or extension of—the very nature of the tort … and … Pennsylvania law but also serves the interests of justice"). Contrary to the trial court's decision, Appellants argue they submitted ample evidence that Appellees intentionally and improperly interfered with its employees and agents by "wrongly inducing" them to join Societe Select. *See* Appellants' Brief at 83.

To state a cause of action for intentional interference with existing contractual relations, a party must prove the following elements:

> (1) the existence of a contractual relationship between the complainant and a third party;
>
> (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual damage as a result of defendant's conduct.

*Rice Drilling B, LLC*, 325 A.3d at 677 (cleaned up).

The elements, enumerated above, are the same for intentional interference with a prospective contractual relationship, except that Appellants must establish a prospective contractual relationship instead of an existing one. **See Phillips v. Selig**, 959 A.2d 420, 429 (Pa. Super. 2008) (defining "prospective contractual relationship" as "[a]nything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. There must be something more than a mere hope or the innate optimism of the salesman.") (quoting **Glenn v. Point Park College**, 272 A.2d 895, 898-99 (Pa. 1971)).

Upon review of the record, we find that Appellants' attempt to group the Serhant Appellees with the Edrei Appellees in their intentional interference of contractual relationships claim is grounded in speculation, yet again. **See** Oller Deposition, 1/29/24, at 24-26 (stating only evidence of Ryan Serhant being involved in "deceptive practices" with Edrei Appellees was that he had "[s]een [Ryan] Serhant on video with my clients on social media" and his counsel told Oller that Serhant reached out to his clients.); Gambhir Deposition, 1/31/24, at 21 ("It is physically not possible for me to know where Ryan Serhant would have met behind the doors with other people."). Moreover, Appellants are unable to establish that Serhant Appellees acted with the intent to harm Appellants or lacked privilege or justification regarding Black Label employee contracts. Societe Select is independently contracted with Serhant, and therefore, Skokowski and Bondiskey are not employed by Serhant. **See** Fitzgerald Deposition, 4/24/24, at 113 ("No, [] Bondiskey is not with

Serhant."); Skokowski/Serhant Independent Contractor Agreement, 4/2/23. Accordingly, Appellants' interference with contractual relationships claim for Serhant Appellees is meritless.

With respect to Edrei Appellees' alleged interference with Black Label's clients or prospective clients, Appellants have failed to identify any existing contracts or potential prospective contracts that Appellees interfered with, and therefore, they have failed to prove damages, once again. *See* MSJ Exhibit 34 (Black Label Exclusive Listing Agreements). We agree with the trial court, which found that Edrei Appellees provided affidavits and email confirmation from clients that state they left Black Label unsolicited. *See* Trial Court Opinion, 2/13/25, at 9; Edrei Appellees MSJ Exhibit 12 (Client Affidavits and Emails). This evidence proves that no existing listing agreements were violated by Edrei Appellees; rather, client agreements were allowed to expire, and the properties were thereafter listed with Edrei's new firm, as those owners desired and as was their right. *See* Gambhir Deposition, 1/31/24, at 71-72 (stating clients do not technically belong to any brokerage or agent unless contractual).

We also find that Appellants' have failed to establish that Edrei Appellees interfered with Black Label employee contracts. The only employment contract that Black Label focuses on is Bondiskey. *See* Appellants' Reply Brief at 37-38. However, even if Bondiskey breached her contract, Appellants have failed to prove actual damages. ***See Rice Drilling B, LLC***, 325 A.3d at 677. In conclusion, we find that Appellants' claim that the trial court erred in

granting summary judgment for Edrei Appellees for intentional interference of contractual relationships is meritless.

## 6. Civil Conspiracy

Finally, Appellants argue the trial court erred in granting summary judgment to Appellees regarding Appellants' civil conspiracy claim because Appellants submitted evidence establishing genuine issues of material fact as to that claim. *See* Appellants' Brief at 84-85. Appellants state that they have put forward "overwhelming evidence" establishing viable tort claims against Appellees and have demonstrated that the Appellees collectively worked together to take Black Label's business and destroy its ability to operate. *See id.*

> To state a cause of action for civil conspiracy, a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy. Thus, to withstand summary judgment on this claim, [the plaintiffs] must have produced evidence which would establish that [the defendants] acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.

*Commerce Bank/Pa. v. First Union Nat'l Bank*, 911 A.2d 133, 143 (Pa. Super. 2006) (citations omitted and formatting altered). A plaintiff must establish a valid underlying civil claim before it can prevail on a civil conspiracy claim. *See Rock v. Rangos*, 61 A.3d 239, 249 (Pa. Super. 2013).

Appellants have no claim for civil conspiracy because all their tort claims fail against Appellees for lack of evidentiary support, as explained in detail above. Therefore, the trial court properly dismissed Appellants' civil conspiracy

claim for all Appellees. *See* Trial Court Opinion, 2/13/25, at 10. Accordingly, Appellants' sixth claim is due no relief.

As none of Appellants' issues warrant relief, we affirm the order granting summary judgment in favor of Appellees and against Appellants.

Order affirmed.

Judge Murray joins the opinion.

Judge McLaughlin concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/30/2026